67 P.3d 810

**TIG INSURANCE COMPANY,**
Respondent–Appellant/Appellant,

v.

**Genevieve KAUHANE, Claimant–**
**Appellee/Appellee,**

and

**J.P. Schmidt, Insurance Commissioner, State of Hawai'i, Department of Commerce and Consumer Affairs, Appellee/Appellee.**[1]

No. 24219.

Intermediate Court of Appeals of Hawai'i.

March 28, 2003.

1. At the time this case arose, Wayne C. Metcalf, III was the Insurance Commissioner with the State of Hawai'i, Department of Commerce and Consumer Affairs (the Insurance Commissioner), the Appellee/Appellee in this appeal. Pursuant to Hawai'i Rules of Appellate Procedure, Rule 43, relating to substitution of parties, the current Insurance Commissioner, J.P. Schmidt, has been substituted as the named party to this case.

Katharine M. Nohr (Miyagi, Nohr & Myhre), Honolulu, for respondent-appellant/appellant.

Neal K. Aoki (Koshiba, Agena & Kubota), Honolulu, for claimant-appellee/appellee.

Deborah Day Emerson and David A. Webber, Deputy Attorneys General, State of Hawai'i for appellee/appellee.

BURNS, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

This secondary appeal involves the proper interpretation of Hawaii Revised Statutes (HRS) § 431:10C–304(3) (1993), which imposes certain obligations on a no-fault insurer in handling claims for no-fault insurance benefits.

Appellee/Appellee Insurance Commissioner for the State of Hawai'i (the Insurance Commissioner), in an August 4, 2000 Final Order that was affirmed by a Final Judgment entered by the Circuit Court of the First Circuit (the circuit court)[2] on March 20, 2001, ruled that Respondent–Appellant/Appellant TIG Insurance Company (TIG) violated HRS § 431:10C–304(3)(C) by not granting or denying the claim for no-fault benefits submitted by Claimant–Appellee/Appellee Genevieve Kauhane (Kauhane or Mrs. Kauhane) within thirty (30) days after TIG reasonably determined that the additional in-

formation it had requested from Kauhane's doctors to assist TIG in evaluating the merits of Kauhane's claim would not be forthcoming. The Insurance Commissioner further concluded that TIG's violation of the procedural requirements of HRS § 431:10C–304(3)(C) barred it from contesting the merits of Kauhane's claim and, accordingly, ordered TIG to pay no-fault benefits to Kauhane and attorney's fees and costs to Kauhane's attorney.

■ We conclude that TIG violated the time requirements of HRS § 431:10C–304(3)(C) when it delayed granting or denying Kauhane's claim for no-fault benefits pending (1) receipt of answers from Kauhane's treating physicians to TIG's questions regarding the underlying cause of the medical condition that required Kauhane to undergo bypass surgery a few days after a motor vehicle accident, and (2) Kauhane's undergoing two independent medical examinations (IMEs). We hold, however, that the Insurance Commissioner wrongly concluded that TIG's violation of these time requirements procedurally barred TIG from contesting the substantive merits of Kauhane's claim.

Accordingly, we vacate the Final Judgment entered by the circuit court on March 20, 2001 and remand this case to the circuit court, with instructions that the circuit court vacate the Insurance Commissioner's Final Order dated August 4, 2000 and remand this case to the Insurance Commissioner for further proceedings on the substantive merits of Kauhane's claim, consistent with this opinion.

Our disposition of this appeal renders it unnecessary to resolve TIG's challenge to the Insurance Commissioner's award of attorney's fees and costs to Kauhane.

## BACKGROUND

### A. *Kauhane's Medical History*

Kauhane has a long history of coronary artery disease, hypertension, and hyperthyroidism. In January 1991, Kauhane underwent a successful coronary angioplasty[3] of

---

2. Judge Eden Elizabeth Hifo entered the Final Judgment from which this appeal was taken.

3. Angioplasty is the "surgical reconstruction of blood vessels." *The Sloane Dorland Annotated Medical–Legal Dictionary* 37 (1987).

her anterior descending coronary artery. In April 1996, Kauhane developed unstable angina [4] and had a significant blockage of her right coronary artery. To correct this condition, she underwent another coronary angioplasty. Thereafter, her medical condition appeared stable, and she did not complain of chest pain or discomfort.

### B. *The Motor Vehicle Accident*

On July 7, 1996, Kauhane was still recovering from the angioplasty and had not returned to work. That day, while she was a seat-belted passenger in the front seat of a car traveling south on Pililā'au Avenue in Nānākuli, a north-bound vehicle crossed the center lines of the road and sideswiped the car Kauhane was riding in. As a result of the collision, Kauhane was thrust forward into the shoulder strap of her seat belt.

Following the accident, Kauhane complained of chest pain and was taken by ambulance to the Waianae Coast Comprehensive Health Center (WCCHC). There, an electrocardiogram [5] taken of Kauhane's heart "did not show any changes[.]" Kauhane was diagnosed as having acute anxiety and soft tissue injuries, and after her chest pain subsided later that day, she was released from WCCHC.

When the chest pain returned the next day, Kauhane was examined by her regular internist, Dr. Aaron Nada (Dr. Nada), and a cardiologist, Dr. Roy O. Kamada (Dr. Kamada). Dr. Nada ordered an x-ray of Kauhane's chest and ribs. The x-ray revealed that Kauhane's chest was bruised.

Over the next few days, the dull ache in Kauhane's chest grew, and on July 11, 1996, Kauhane returned to WCCHC, complaining of intense chest pain of a one-hour duration. On July 12, 1996, she was transferred to Kuakini Medical Center (KMC), where she was examined by Dr. Kamada. Dr. Kamada reported that Kauhane had been in pain for three hours upon admission to KMC and determined that Kauhane would need bypass surgery on her right coronary artery and left anterior descending artery. The surgery was performed on July 18, 1996. Kauhane was released from KMC a week later, and her condition has been stable since then.

### C. *Kauhane's Claim for No–Fault Benefits*

At the time of the accident, Kauhane was covered under a no-fault insurance policy provided by TIG.[6] On October 11, 1996,[7] Kauhane submitted to TIG a claim for no-fault benefits, dated September 17, 1996, and copies of medical bills she had incurred for the bypass surgery and treatment after the accident. TIG received the claim on October 14, 1996. On October 29, 1996, Kauhane submitted to TIG copies of additional medical bills.

On November 13, 1996, TIG responded to Kauhane that it needed "to investigate and obtain information and/or medical records of [her] past medical history" before determining whether to pay her bills. The same day, TIG wrote letters to Kauhane's medical providers,[8] requesting Kauhane's medical records, and also wrote to Dr. Nada, requesting information on Kauhane's medical history.[9]

4. Angina is "spasmodic, choking, or suffocative pain[.]" *Id.* at 35.

5. An electrocardiogram is "a graphic tracing of the variations in electrical potential caused by the excitation of the heart muscle and detected at the body surface." *Id.* at 242. It shows "the changes in electrical potential produced by heart contractions and is an important tool in diagnosing disruption of normal heart function." *Id.*

6. According to the record, Claimant Appellee/Appellee Genevieve Kauhane's (Kauhane) health insurance provider, Hawaii Medical Services Association, paid for Kauhane's bypass surgery.

7. The record indicates that Kauhane had earlier submitted to Respondent Appellant/Appellant TIG Insurance Company (TIG) a claim for no-

fault benefits that was dated July 10, 1996. TIG apparently never received this claim.

8. The record on appeal indicates that on November 13, 1996, TIG sent letters to Kuakini Medical Center and Waianae Coast Comprehensive Health Center, requesting itemized records for Kauhane.

9. The letter to Dr. Aaron Nada (Dr. Nada) requested that he provide TIG with the following information regarding Kauhane:
 1. Did/have you seen and/or treated her for the automobile accident? If you have, please submit your bills with the chart notes.
 2. Diagnosis (auto related).
 3. If [sic] she still under your care for the accident? If so, type of treatments being rendered?

On November 20, 1996, Kauhane's attorney wrote to TIG and asked for a determination of Kauhane's claim for no-fault benefits by November 30, 1996.

On December 18, 1996, TIG wrote to Dr. Kamada, requesting that he answer the following questions:

1. Did the automobile accident of 7/7/96 aggravate Mrs. Kauhane's pre-existing condition(s)? If so, please explain.
2. If the aggravation had anything to do with the bypass surgery? If it did, please explain.
3. If Mrs. Kauhane was not involved in this automobile accident, was the bypass surgery necessary?

On January 6, 1997, Kauhane's attorney wrote to TIG, requesting an update of the status of Kauhane's claim and copies of all records in TIG's possession relating to the claim. Kauhane's attorney also offered to assist TIG in obtaining medical records or information that TIG needed to evaluate Kauhane's claim.

On January 21, 1997, TIG responded that it had not yet received replies from Drs. Nada and Kamada to TIG's written requests for information. That same day, TIG wrote to both doctors, requesting replies to its prior letters and informing them that if TIG received no reply from them by January 31, 1997, it would "conclude that Mrs. Kauhane's conditions/symptoms/problems, surgery and treatments prior and following the auto accident were not in anyway [sic] related to the [July 7, 1996] auto accident."

On January 28, 1997, Dr. Nada provided TIG with medical records for Kauhane's bypass surgery and his answers to the questions posed by TIG in its November 13, 1996 letter to him.[10] Thereafter, on February 27, 1997, TIG sent Dr. Nada another letter, requesting "further information concerning

4. List all of her prior/pre-existing medical conditions.
5. Are you treating/seeing her for her prior/pre-existing conditions? .
6. Who is the primary treating physician; for the angioplasty and bypass?

**10.** Dr. Nada answered that: he had seen and/or treated Kauhane for the automobile accident; diagnosed her as having chest pain; she was

[Kauhane's] surgery, to assist [TIG] in determining whether any part of the surgery and treatments thereafter were/are in fact related to the ... accident." Specifically, TIG asked Dr. Nada the following questions:

1. Did the ... accident cause any degree of aggravation of Mrs. Kauhane's multiple pre-existing problems/conditions? If if [sic] did, please stipulate what percent, nature of treatments rendered; related to the aggravation and when did she return to pre-accident status? If she has not returned to pre-accident status, please state when you feel she will have reached this point?
2. If the accident did cause a degree of aggravation, was the aggravation the sole cause Mrs. Kauhane had to undergo the bypass surgery? (Please be specific in your response providing an explanation of how the aggravation was the sole factor for the surgery)
3. If the aggravation was not the sole cause of the surgery, was the aggravation partly the reason surgery had to be performed? (Please be specific in your response and explain what role the accident was partly the cause for surgery)
4. Had the accident not occur, [sic] due to Mrs. Kauhane's pre-existing problems/conditions, would the surgery, more than likely, have been necessary?
5. Prior to the auto accident, on Mrs. Kauhane's most recent visit to you, were there indications that the surgery would be needed/discussed?
6. You say that treatments for the accident consist of medications for her heart and blood pressure. Was Mrs. Kauhane being treated with these medications prior to the accident?

still under his care and being treated with heart and blood pressure medications; she had the following prior/pre-existing medical conditions: hypertension, degenerative joint disease, diabetes mellitus, and coronary artery disease; he was treating/seeing her for her prior/pre-existing conditions; and her primary treating physicians for the angioplasty and bypass were Drs. Dean Nakamura and Roy O. Kamada (Dr. Kamada).

When Dr. Nada did not promptly answer the foregoing questions, TIG sent him two letters, the first dated March 20, 1997 and the second dated April 17, 1997, requesting a response. The April 17, 1997 letter informed Dr. Nada that if TIG did not receive a response within ten days, it would "conclude that the bills/[Hawaii Medical Services Association] statements; treatments for Mrs. Kauhane's surgery, were not in anyway [sic] related to the above dated accident." By a letter dated April 25, 1997, Dr. Nada referred TIG to Dr. Kamada for an explanation of the possible causal link between the car accident and the bypass surgery. Dr. Nada added that he "would concur with whatever assessment Dr. Kamada should arrive at."

On May 21, 1997, TIG wrote to Dr. Kamada for the purpose of determining "whether [Kauhane's] recent bypass surgery was in anyway [sic] related to this accident." TIG enclosed copies of the correspondence between it and Dr. Nada and asked Dr. Kamada to address the questions raised by TIG in its letter to Dr. Nada, dated February 27, 1997. On June 12, 1997, Dr. Kamada wrote to Kauhane's attorney, stating:

In response to your questions, Mrs. Kauhane's Angioplasty was performed in April 1996 because of symptoms of angina and severe narrowing of her right coronary vessel. Stent was not placed at that time. Following the procedure, the patient was pain-free till July,1996 [sic] when she was admitted for recurrent angina. Her Angiogram demonstrated progression of her anterior descending lesion as well as her right coronary vessel. These represented fairly long lesions and I felt that surgery would be a more feasible option rather than Angioplastic intervention.

Since her surgery, she has had excellent recovery.

Except for her automobile accident on July 7, 1996, I am not aware of any unusual events that had occurred to [Mrs. Kauhane]. Any kind of psychological or physical stress can aggravate coronary heart disease.

By a letter dated June 18, 1997, Kauhane's attorney wrote to TIG, enclosing Dr. Kamada's letter and asking for a determination of Kauhane's claim as soon as possible. By a letter to Kauhane's attorney dated June 19, 1997, which was apparently sent out before TIG received the June 18, 1997 letter from Kauhane's attorney, TIG mentioned that it was still awaiting a response from Dr. Kamada to the questions TIG had posed to Dr. Nada. Since it did not appear that Dr. Kamada and Dr. Nada would be responding to TIG's request, TIG wanted Kauhane to undergo an IME by one of three named cardiologists.

Kauhane's attorney responded to TIG's June 19, 1997 letter on June 26, 1997, reminding TIG that Dr. Kamada had submitted a response. On July 17, 1997, TIG replied, stating:

Thank you for Dr. Kamada's letter. As you know, Dr. Kamada's response is very vague and does state [sic] whether the aggravation of above dated accident was the cause for surgery, an apportionment, etc.

It is highly unlikely that Dr. Nada and Dr. Kamada will respond to the specific questions we have concerning Mrs. Kauhane's surgery, therefore, we are hereby requesting that Mrs. Kauhane submit to [an IME] pursuant to the Hawaii Administrative Rules.

We did·submit the names of three physicians earlier to you. Please advise us within the next thirty (30) days as to which physician Mrs. Kauhane has chosen and we will make the necessary arrangements and send to your office a written confirmation of the date, time, etc.

Please be advised if no response is received within the next thirty (30) days, we will reserve the right to deny further no fault benefits.

From the list of physicians furnished by TIG, Kauhane chose Dr. Danelo R. Canete (Dr. Canete) to conduct the IME. After then being informed by TIG that Dr. Canete had retired, Kauhane selected Dr. Stephen J. Wallach (Dr. Wallach) to perform the IME.

Dr. Wallach examined Kauhane on August 22, 1997. On August 24, 1997, he submitted his report to TIG, concluding that Kauhane's bypass surgery was unrelated to the car

accident and that the surgery would have been necessary even if the car accident had not occurred. Based on this report, TIG denied Kauhane's request for no-fault benefits on September 16, 1997. On November 10, 1997, Kauhane requested a review by the Insurance Commissioner of TIG's denial, and the matter was docketed as MV–97–1656.

On September 24, 1997, after discovering that Dr. Canete had not retired and was still in active practice, Kauhane's attorney wrote to TIG, requesting that Kauhane be allowed to undergo an IME performed by Dr. Canete. Meanwhile, Kauhane retained Dr. David J.G. Fergusson (Dr. Fergusson) to do an IME on November 3, 1997. After examining Kauhane and her medical records,[11] Dr. Fergusson concluded, in his report dated November 29, 1997:

> While it is clear that [Mrs. Kauhane] has long-standing coronary artery disease, and that progression of this disease has occurred regardless of external events, nonetheless, for the reasons stated above, I believe that aggravation of this underlying

condition may have occurred as a result of the motor vehicle accident on 7/7/97.

On December 17, 1997, Kauhane was examined by Dr. Canete. Dr. Canete also reviewed Kauhane's medical records and the previous reports by Kauhane's physicians. In a March 10, 1998 report, he concluded that the accident did not cause an aggravation of Kauhane's pre-existing condition, explaining as follows:

> The temporal relationship does not support a relationship. Her symptoms compatible with unstable angina occurred 4 days after the accident. Note that angina was not noted immediately after the accident. If we use the analogy of a straw that breaks the camel's back, it would seem that the immediate stresses incurred by that accident which would have been at its peak at the time of accident did not cause the camel's back to break.

Dr. Canete opined that Kauhane would have required surgery even if the accident had not occurred:

> It was time and followed the natural course of events for this disease process.

11. In his report, Dr. David J.G. Fergusson (Dr. Fergusson) reviewed Kauhane's medical history as follows:

[Kauhane] underwent coronary angiography, by Dr. Kamada in January 1991, and was found to have very severe narrowing of her anterior descending artery. Shortly thereafter, she underwent coronary angioplasty with a satisfactory outcome.

She apparently had *no significant anginal symptoms until April 1996* when she presented with unstable angina. Dr. Kamada performed another angiogram and this showed that there was now severe narrowing of the right coronary artery. The previously dilated area of the anterior descending artery was reported to show some irregularity, but was not considered to have become severely narrowed again. Dr. Kamada performed angioplasty on the right coronary artery. Following that procedure, and up until the time of her accident, she did not report any chest pain or discomfort. From the above, it is apparent that the right coronary artery became more severely narrowed between 4/22/96 and 7/17/96, and that the anterior descending artery also showed increased narrowing during that period of time.

The narrowing in the right coronary artery is readily explained on the basis of restenosis, which is a common occurrence following coronary angioplasty. The time interval between

the angioplasty and the repeat angiogram is quite typical for the time that it takes for restenosis to occur.

The increased narrowing of the anterior descending artery is not as readily explained. It is possible that the change in its appearance is more apparent that [sic] real and that the difference is due to technical factors associated with the two angiogram tests. On the other hand, if the change is real, then it would be an unusual coincidence for the narrowing in this vessel to have progressed at that particular time, and it is certainly tempting to speculate that the accident may have played a role. Blunt trauma to the chest has been, in rare instances, known to cause damage to coronary arteries, especially the anterior descending artery, because of its position on the front of the heart. While the severity of chest trauma in this case does not appear to be very severe (i.e. no steering wheel injury and no broken bones), it is not impossible that the accident did produce enough deceleration injury to further disrupt an unstable plaque in the artery.

The discrepancy between the patient's description of steadily increasing pain between 7/7/97 and 7/12/97, and Dr. Kamada's description of apparently separate pains could imply that the earlier pain was not cardiac, but the pain of unstable angina may have a "stuttering" pattern, so that this discrepancy does not exclude the possibility that a coronary event dated from the time of the accident.

There are a variety of factors that affect the clotting mechanism or factors in the blood vessel wall that may cause partial incomplete blockage that cause these symptoms.

On March 16, 1998, TIG again denied Kauhane's no-fault claim, this time based on Dr. Canete's report.

On May 13, 1998, following TIG's second denial of Kauhane's claim for no-fault benefits, Kauhane filed another request with the Insurance Commissioner for a review hearing. This review request was docketed as MVI–98–1001. On December 15, 1999, both matters relating to Kauhane's claim were consolidated and scheduled for a hearing on February 4, 2000.

### D. *The Proceedings Before the Insurance Commissioner*

On March 31, 2000, the hearings officer who heard the consolidated cases issued her Findings of Fact, Conclusions of Law, and Recommended Order (Recommended Order), recommending that the Insurance Commissioner (1) "find and conclude that [TIG's] denials of September 16, 1997 and March 16, 1998 were improper and that [TIG] be ordered to pay [Kauhane's] contested no-fault benefits[,]" and (2) award Kauhane reasonable attorney's fees and costs, to be paid directly to Kauhane's attorney.

The basis for the Recommended Order was that TIG's denial of Kauhane's claim for no-fault benefits was "procedurally improper" because TIG had failed to comply with applicable statutory and/or regulatory provisions, specifically, HRS § 431:10C–304(3) (1993).[12] Therefore, TIG was "obligated to pay for the contested no-fault benefits" without the substantive merits of Kauhane's claim being addressed. Of specific relevance to this appeal are the following Conclusions of Law entered by the hearings officer:

By June of 1997, ... when [TIG] concluded that it had received all of [Kauhane's] medical records and physician responses that it could reasonably anticipate receiving, it was obligated to either pay or deny the claim for benefits. Instead, [TIG] failed to issue any written decision and required [Kauhane] to go through further hurdles before it would formally accept or deny the claim. Although [TIG] may not have been satisfied by the responses of [Kauhane's] physicians, it had obtained the additional information it requested pursuant to HRS § 431:10C–304(3)(C), and it was improper for [TIG] to continue to hold payment of the no-fault claim without issuing any actual denial.

It is well settled that an insurer cannot withhold payment of no-fault benefits pending the outcome of an IME. Prior case law such as *Khan–Miyasaki v. State Farm*, MVI–94–276 (CFO March 12, 1966); *Boyle v. State Farm*, MVI–92–103 (CFO September 15, 1993) reflected the well-reasoned determination that a request for an IME does not constitute a request for additional information pursuant to HRS § 431:10C–304(3)(C). Therefore, an insurer's refusal to pay no-fault benefits pend-

---

12. At the time of Kauhane's accident, Hawaii Revised Statutes (HRS) § 431:10C–304(3) (1993) provided as follows:

**Obligation to pay no-fault benefits.** For purposes of this section, the term "no-fault insurer" includes no-fault self-insurers. Every no-fault insurer shall provide no-fault benefits for accidental harm as follows:

. . . .

(3) (A) Payment of no-fault benefits shall be made within thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof.

(B) Subject to section 431:10C–308.6, relating to peer review, if the insurer elects to deny a claim for benefits in whole or in part, the insurer shall within thirty days notify the claimant in writing of the denial and the rea-

sons for the denial. The denial notice shall be prepared and mailed by the insurer in triplicate copies and be in a format approved by the commissioner. In the case of benefits for services specified in section 431:10C–103(10)(A)(i) and (ii), the insurer shall also mail a copy of the denial to the provider.

(C) If the insurer cannot pay or deny the claim for benefits because additional information or loss documentation is needed, the insurer shall, within the thirty days, forward to the claimant an itemized list of all the required documents. In the case of benefits for services specified in section 431:10C–103(10)(A)(i) and (ii), the insurer shall also forward the list to the service provider.

ing an IME constitutes a prospective denial and is improper. As stated in *Lucas v. AIG Hawaii*, MVI 94–165 (CFO October 30, 1996)[:]

> A respondent may not withhold/deny benefits under HRS § 431:10C–304(3)(C) pending the outcome of a future independent medical examination, or any other unilaterally imposed and clearly impermissible basis. The language of the statute simply does not permit an insurer to impose such conditions, as distinguished from making a reasonable request for existing documents, as a basis for withholding/denying no-fault insurance benefits.

[TIG] simply could not refuse to pay benefits pending [Kauhane] undergoing an IME, and accordingly, its denial of September 16, 1997 was improper.

Next, in considering the denial dated in [sic] March 16, 1998 in MVI–98–1001, it is apparent that this second denial was essentially a re-issuance of the September 16, 1997 denial (MVI–97–1656) for the same billings that [TIG] had already denied. Since it has been concluded herein that the earlier denial was improper and that [TIG] is obligated to pay for these same factually contested benefits, this subsequent denial has been rendered moot, except as to any award of attorney's fees and costs incurred in contesting this denial.

The Hearings Officer concludes that the procedural determination regarding the improper denial by [TIG] of no-fault benefits makes it unnecessary to undertake a determination of the substantive merits of [TIG'S] denial. As stated in *Ramos v. Liberty Mutual*, MVI 99–34–C (CFO September 9, 1999), "when an insurer's conduct in issuing a denial is determined to be procedurally improper behavior because the insurer had failed to comply with applicable statutory and/or regulatory provisions, the insurer is obligated to pay for the contested no-fault benefits and no further proceedings to address the substantive merits, if any, of the denial is required."

(Footnote and some citations omitted.)

On August 4, 2000, the Insurance Commissioner adopted the hearings officer's Recommended Order as his Final Order and also ordered TIG to pay Kauhane's attorney's fees of $11,132.10 and costs of $295.30.

E. *The Proceedings Before the Circuit Court*

On September 6, 2000, TIG appealed to the circuit court from the Insurance Commissioner's Final Order. On March 20, 2001, the circuit court entered (1) an Order Affirming [Insurance] Commissioner's Final Order Dated August 4, 2000 (Affirmance Order), and (2) a Final Judgment in favor of Kauhane and the Insurance Commissioner. In its Affirmance Order, the circuit court found and concluded as follows:

1. The provisions of [HRS § ] 431:10C–304 are required to be read *in pari materia*. Subsection (3)(A) expressly requires the insurer to pay no-fault benefits within 30 days after receiving reasonable proof of the fact and amount of benefits, and the demand for payment thereof. If the insurer elects to deny the claim for benefits, Subsection (3)(B) expressly requires the insurer to notify the claimant of the denial, and the reasons therefor, within 30 days after receiving the claim. In view of these provisions, Subsection (3)(C) requires that, in the event that the insurer cannot pay or deny the claim because additional information or documents are needed, the insurer must either pay or deny the claim within 30 days after (a) receiving the response to its request for information or documents, or (b) the date on which the insurer reasonably determines that no response will be forthcoming.

2. Pursuant to [HRS § ] 431:10C–304(3)(C), TIG requested additional information and documents from [Kauhane's] treating physicians, [Drs. Nada and Kamada], on the issue of causation. On April 25, 1997, TIG received a response from [Dr. Nada]. On June 18, 1997, TIG received Dr. Kamada's report relating to causation dated June 12, 1997.

3. In the event that TIG believed that its efforts to obtain additional information and documents did not bear fruit (i.e. that it did not receive any response, or received an insufficient response, to its request), it could have denied the subject claim on the basis that [Kauhane's] treating physicians were non-responsive. By not doing so at such time, TIG violated [*HRS* § ] 431:10C–304.

4. Having [Kauhane] submit to two (2) [IMEs] had the same effect of withholding payment until the IMEs had occurred.

5. With respect to the Insurance Commissioner's award of attorney's fees and costs to [Kauhane], there has been no showing by TIG that the Insurance Commissioner abused his discretion.

(Citations omitted.)

This appeal followed.

### ISSUES ON APPEAL

The issues raised by TIG on appeal can be summarized as follows:

(1) Whether the circuit court correctly applied HRS § 431:10C–304 in concluding that TIG's denial of no-fault benefits to Kauhane was procedurally improper;

(2) Whether the circuit court correctly affirmed the Insurance Commissioner's decision that TIG's untimely denial of no-fault benefits to Kauhane precluded TIG from contesting the merits of Kauhane's claim; and

(3) Whether the circuit court erred in determining that the Insurance Commissioner did not abuse his discretion in awarding attorney's fees and costs to Kauhane.

### STANDARDS OF REVIEW

A. *Agency Decisions*

 An appellate court's review of a circuit court's review of an administrative agency's decision is a secondary appeal. *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998). In determining whether the circuit court's decision was right or wrong, the appellate court must apply the standards set forth in HRS § 91–14(g) (1993)

to the agency's decision. *Id.* HRS § 91–14(g) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Pursuant to the above statutory provision, an agency's

conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6).

*Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i at 229, 953 P.2d at 1327 (quoting *Bragg v. State Farm Mut. Auto. Ins.,* 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996)). An agency's decision carries a presumption of validity, and the appellant carries the heavy burden of convincing the court that the decision is invalid because it is unjust and unreasonable in its consequences. *Id.* at 229, 953 P.2d at 1327.

B. *Interpretation of a Statute*

 The interpretation of a statute is a question of law that we review *de novo,* applying the right/wrong standard. *Gray v. Administrative Dir. of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997). In applying the right/wrong standard, we examine the facts and answer the question of law

without being required to give any weight to the circuit court's answer to it. *State v. Timoteo*, 87 Hawai'i 108, 113, 952 P.2d 865, 870 (1997).

Where an agency is statutorily responsible for carrying out the mandate of a statute which contains broad or ambiguous language, that agency's interpretation and application of the statute is generally accorded judicial deference on appellate review. *Vail v. Employees' Retirement System*, 75 Haw. 42, 59, 856 P.2d 1227, 1237 (1993). However, an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is "plainly erroneous and inconsistent with both the letter and intent of the statutory mandate[.]" *Kahana Sunset Owners v. County of Maui*, 86 Hawai'i 66, 72, 947 P.2d 378, 384 (1997).

### DISCUSSION

A. *TIG Violated the Time Requirements Specified in HRS § 431:10C–304(3)*

1.

At the time Kauhane's claim arose, HRS § 431:10C–304(3) [13] required no-fault insurers to comply with specific time deadlines in granting or denying a claim for no-fault insurance:

**13.** Currently, HRS § 431:10C–304(3) (Supp. 2002) reads as follows:
(3) (A) Payment of personal injury protection benefits shall be made within thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof. All providers must produce descriptions of the service provided in conformity with applicable fee schedule codes;
(B) If the insurer elects to deny a claim for benefits in whole or in part, the insurer shall, within thirty days, notify the claimant in writing of the denial and the reasons for the denial. The denial notice shall be prepared and mailed by the insurer in triplicate copies and be in a format approved by the commissioner. In the case of benefits for services specified in section 431:10C–103.5(a) the insurer shall also mail a copy of the denial to the provider; and
(C) If the insurer cannot pay or deny the claim for benefits because additional information or loss documentation is needed, the insurer shall, within thirty days, forward to the claimant an

(3) (A) Payment of no-fault benefits shall be made within thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof.
(B) Subject to section 431:10C–308.6, relating to peer review, if the insurer elects to deny a claim for benefits in whole or in part, the insurer shall within thirty days notify the claimant in writing of the denial and the reasons for the denial. The denial notice shall be prepared and mailed by the insurer in triplicate copies and be in a format approved by the commissioner. In the case of benefits for services specified in section 431:10C–103(10)(A)(i) and (ii), the insurer shall also mail a copy of the denial to the provider.
(C) *If the insurer cannot pay or deny the claim for benefits because additional information or loss documentation is needed, the insurer shall, within the thirty days, forward to the claimant an itemized list of all required documents.* In the case of benefits for services specified in section 431:10C–103(10)(A)(i) and (ii),[14] the insur-

itemized list of all the required documents. In the case of benefits for services specified in section 431:10C–103.5(a) the insurer shall also forward the list to the service provider.
None of the changes made to the statute affect this case.

**14.** At the time Kauhane's claim arose, HRS § 431:10C–103(10)(A) (1993) provided, in relevant part, as follows:
(A) No-fault benefits, sometimes referred to as personal injury protection benefits, with respect to any accidental harm means:
(i) All appropriate and reasonable expenses necessarily incurred for medical, hospital, surgical, professional, nursing, dental, optometric, ambulance, prosthetic services, products and accommodations furnished, and x-ray. The foregoing expenses may include any nonmedical remedial care and treatment rendered in accordance with the teachings, faith, or belief of any group which depends for healing upon spiritual means through prayer;
(ii) All appropriate and reasonable expenses necessarily incurred for psychiatric,

er shall also forward the list to the service provider.

(Emphasis and footnote added.)

TIG contends that the Insurance Commissioner incorrectly ruled that by June 1997, TIG "had obtained the additional information it requested pursuant to HRS § 431:10C–304(3)(C), and it was improper for [TIG] to continue to hold payment of [Kauhane's] no-fault claim without issuing any actual denial." TIG points out that it never obtained the "additional information" that it requested from Drs. Nada and Kamada and, therefore, the thirty-day time period specified in HRS § 431:10C–304(3)(A) and (B), within which TIG was required to either grant or deny Kauhane's claim, never began running. In other words, TIG's interpretation of HRS § 431:10C–304(3)(A) and (B) is that an insurer has no duty to either grant or deny a no-fault benefits claim until it receives all the information it requests pursuant to HRS § 431:10C–304(3)(C). TIG asserts that this is so even when the information requested will apparently never be provided or, as in this case, when the information provided was deemed insufficient by the insurer.

In contrast, the Insurance Commissioner's interpretation of HRS § 431:10C–304(3)(C) is that, although insurers are entitled to ask for additional information and loss documentation pursuant to HRS § 431:10C–304(3)(C), once an insurer reasonably determines that it has received all of the additional information that will be provided (i.e., the rest of the requested information will not be forthcoming), the insurer is required by HRS § 431:10C–304(3)(A) and (B) to grant or deny the claim within thirty days of that determination. That is, an insurer cannot indefinitely refuse to make a determination on a claim for no-fault benefits simply because it did not receive every piece of information requested or because the information it received was not as responsive as the insurer would have liked. Furthermore, the insurer has no right to hold off making a determination pending IMEs.

physical, and occupational therapy and

2.

In construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning. Finally, in determining the purpose of the statute, we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history. *State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (brackets, citations, ellipsis, and internal quotation marks omitted). Furthermore,

[w]e must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. .

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (block quote format, brackets, citations, ellipses, and internal quotation marks omitted).

rehabilitation[.]

Applying the foregoing principles of statutory construction to HRS § 431:10C–304(3), it is initially obvious, as the differing interpretations of the statute by TIG and the Insurance Commissioner confirm, that the language of the statute is *not* plain and unambiguous. Specifically, it is unclear from the face of the statute: (1) what constitutes "reasonable proof of the fact and amount of [no-fault] benefits accrued" for purposes of triggering the insurer's obligation under HRS § 431:10C–304(3)(A) to pay no-fault benefits within thirty days after receiving such proof; and (2) what "additional information or loss documentation" an insurer can require a claimant to submit under HRS § 431:10C–304(3)(C). Because of the ambiguity in the language of the statute, we turn to an examination of the legislative history of the provision.

### 3.

HRS § 431:10C–304 has a long legislative history. In 1973, the Hawai'i legislature enacted HRS § 431:10C–304's predecessor statute into law, pursuant to 1973 Haw. Sess. L. Act 203, § 1 at 381. Codified as HRS § 294–4, the predecessor statute provided as follows:

> **Obligation to pay no-fault benefits.** Every no-fault and self-insurer shall provide no-fault benefits for injury and death as follows:
>
> . . . .
>
> (2) Payments for no-fault benefits shall be made as such benefits accrue except that in the case of death, payment for such benefits may, at the option of the beneficiary, be made immediately in a lump sum payment. Amounts of benefits accrued unpaid thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof shall, after the expiration of such thirty days, bear interest at the rate of one and one-half per cent per month.

The House Committees on Consumer Protection, Judiciary, and Finance explained that the foregoing statutory section

requires a reparation insurer to respond to a claim within a certain time. Delay in payments of basic reparation benefits are subject to 18% per annum penalty. Attorney's fees may be charged against the reparations insurer if overdue benefits are recorded in any action against it[.]

Hse. Stand. Comm. Rep. No. 187, in 1973 House Journal, at 839.

In 1983, the legislature passed House Bill No. 274, which was signed into law as Act 261, amending HRS § 294–4 as follows:

> **Obligation to pay no-fault benefits.** Every no-fault and self-insurer shall provide no-fault benefits for accidental harm as follows:
>
> . . . .
>
> (2) [Payments for] Payment of no-fault benefits shall be made as [such] the benefits accrue except that in the case of death, payment [for such] of the benefits may, at the option of the beneficiary, be made immediately in a lump sum payment. [Amounts of benefits accrued unpaid thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof shall, after the expiration of such thirty days, bear interest at the rate of one and one-half per cent per month.]
>
> (3) Payment of no-fault benefits shall be made within thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof. If the insurer elects to deny a claim for benefits in whole or in part, the insurer shall within thirty days notify the claimant in writing of denial and the reasons for the denial. The denial notice shall be prepared and mailed by the insurer in triplicate copies and be in a format approved by the commissioner. If the insurer cannot pay or deny the claim for benefits because additional information or loss documentation is needed, the insurer shall, within the thirty days, forward

the claimant an itemized list of all the required documents.

(4) Amounts of benefits which are unpaid thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof, after the expiration of the thirty days, shall bear interest at the rate of one and one-half per cent per month.

. . . .

(6) Any insurer who violates the provisions of this section shall be subject to the provisions of subsections 294–39(b) and (c).

(Repealed statutory material bracketed; new material underscored.)

In House Standing Committee Report No. 526, 1983 House Journal, at 1074–75, the House Consumer Protection and Commerce Committee explained the reasons for the changes as follows:

The purpose of this bill is to improve the operation and administration of the law relating to motor vehicle reparations by clarifying the definition of "motor vehicle", requiring insurers to pay no-fault claims within 15 days, providing that payment of no-fault benefits are secondary to social security and workers' compensation benefits, and allowing the insurance commissioner to award attorney's fees in no-fault administrative hearings and retain jurisdiction over claims which exceed $5,000 solely by virtue of late-payment penalties.

Testimony was given by the Department of Commerce and Consumer Affairs in support of the bill and further recommending that no-fault benefits be paid secondary only to workers' compensation benefits.

Testimony was received from the Hawai'i Independent Insurance Agents Association and the Hawaii Insurer's Council objecting to requiring payment of claims within 15 days. It was felt that such a short time period would impede adequate investigations of claims. The insurance industry supported the change to make no-fault benefits secondary only to workers' compensation benefits.

Presently, there is no requirement that an insurer pay a no-fault claim within any time period, however interest begins to accrue after 30 days at 1 1/2% per month. In addition to requiring insurers to pay within 15 days, this bill imposes a penalty for failure to pay and interest after the 15 days. Your Committee feels that the 15 day period is too short and has amended this bill to require payment within 30 days. The penalty for failure to pay will substantially serve to strengthen the former law.

In 1987, as part of a wholesale revision of Hawai'i's Insurance Code, all existing statutes on insurance, including HRS § 294–4(3), were repealed. 1987 Haw. Sess. L., vol. 2, Act 347, at 1. In their place, new statutory chapters, among them HRS chapter 431, were adopted. See HRS § 431:1–100 (1993). Under the revision, HRS § 294–4 was replaced by HRS § 431:10C–304. See Insurance Law Revision Corresponding Section Reference Table (1987), HRS (1993), vol. 8, at 481. HRS § 431:10C–304, as enacted in 1987, provided as follows:

(3) (A) Payment of no-fault benefits shall be made within thirty days after the insurer has received reasonable proof of the fact and amount of benefits accrued, and demand for payment thereof.

(B) If the insurer elects to deny a claim for benefits in whole or in part, the insurer shall within thirty days notify the claimant in writing of denial and the reasons for the denial. The denial notice shall be prepared and mailed by the insurer in triplicate copies and be in a format approved by the commissioner.

(C) If the insurer cannot pay or deny the claim for benefits because additional information or loss documentation is needed, the insurer shall, within the thirty days, forward the claimant an itemized list of all the required documents.

1987 Haw. Sess. L., vol. 2, Act 347, § 2 at 165. According to a December 15, 1986 "Report to the Insurance Commissioner" that explained the proposed comprehensive revision of the Insurance Code,

[A]rticle 10C is the new location for current Chapter 294, the Hawaii ·No Fault Law. The motor vehicle laws were brought within Chapter 431 in an effort to consolidate all the insurance laws into one chapter. Although Chapter 10C is contained within the insurance code, in most respects it is a self-contained article, and application of other sections of the insurance code to Article 10C is limited.

The sections of the existing no-fault law have been rearranged, and the three parts of Chapter 294 have been replaced with five parts:

. . . .

Part III: Coverages and Rights,

. . . .

*Part III, concerning Coverages and Rights under no-fault policies, is virtually the same as sections of Chapter 294. Changes made were editorial: to arrange sections in outline form for easier reading or to clarify ambiguous language.*

*Report to the Insurance Commissioner* (Dec. 15, 1986) at 13–14 (emphasis added).

Since no substantive changes were made to HRS § 294–4 when the section became HRS § 431:10C–304 during the 1986 revisions, the legislative history of HRS § 294–4 is relevant to an understanding of the legislative purpose in enacting the section.

4.

The legislative history of HRS § 294–4 indicates that when the thirty-day time period for an insurer to act upon a claim for no-fault benefits was established, the legislature selected the thirty-day time period as a compromise to insurers, who objected to the proposed fifteen-day time period as being insufficient to conduct an investigation into a claim. The legislature, however, expressed a clear need "to strengthen the former law" by requiring that claims be paid or denied with-

in a specific time period and by imposing an interest penalty on an insurer if payment was not made within the time period. Hse. Stand. Comm. Rep. No. 526, in 1983 House Journal, at 1075.

The history of HRS § 431:10C–304, as reflected in the history of HRS § 294–4, thus evinces a clear legislative intent that insurers investigate and act on claims promptly, i.e., within thirty days of receipt of "reasonable proof of the fact and amount of benefits accrued, and demand for payment."

5.

Subparagraphs (A) and (B) of HRS § 431:10C–304(3) do not define what constitutes "reasonable proof of the fact and amount of [no-fault] benefits accrued" for purposes of triggering the thirty-day time period within which an insurer must investigate and either grant or deny a claim for no-fault benefits. However, pursuant to subparagraph (C) of HRS § 431:10C–304(3), which must be read *in pari materia* with subparagraphs (A) and (B), an insurer that·"cannot pay or deny [a] claim for [no-fault] benefits because additional information or loss documentation is needed," "shall, within the thirty days, forward to the claimant an itemized list of all the required documents."

The statute does not specify exactly what documents an insurer can require a claimant to provide. Furthermore, although the Insurance Commissioner was, at the time Kauhane's claim arose, specifically authorized by HRS § 431:2–201(c)(1) (1993) to "[m]ake, subject to [HRS] chapter 91, reasonable rules and regulations for effectuating any provision of this code, except those relating to the commissioner's appointment, qualifications, or compensation[,]" [15] the Insurance Commissioner had not promulgated, and to this day still has not promulgated, any administrative rules to effectuate the provisions of HRS § 431:10C–304.[16]

**15.** HRS § 431:2–201(c)(1) (Supp.2002) currently provides:
(c) The commissioner may:
(1) Make reasonable rules for effectuating any provision of this code, except those relating to the commissioner's appointment, qualifications, or compensation. The commissioner shall adopt rules to effectuate article

10C of chapter 431, subject to the approval of the governor's office and the requirements of chapter 91.

**16.** It appears from the record on appeal that the Insurance Commissioner has been determining what constitutes "reasonable proof of the fact and amount of [no-fault] benefits accrued" on a

In the absence of rules fleshing out the ambiguous portions of HRS § 431:10C–304(3), we must construe the statute in a manner that would best effectuate the legislative purpose of the requirement imposed on an insurer to act upon a claim for no-fault benefits within thirty days of receiving "reasonable proof of the fact and amount of [no-fault] benefits accrued, and demand for payment."

■ TIG's position is that it did not violate HRS § 431:10C–304(3) because it never obtained the "additional information" it requested from Drs. Nada and Kamada pursuant to subparagraph (C). According to TIG,

[b]y requesting additional information within thirty (30) days, which was done in this case, TIG expanded the time for it to issue a denial or make payment. If the information had been provided, TIG would then have thirty days from the date of receipt of the information requested to pay or deny. Since the information was never provided, TIG's duty to pay or deny never came to fruition.

. . . .

In order for TIG to be obligated to pay for by-pass surgery, there had to be some reasonable proof that the condition was related to the motor vehicle accident. The treating physicians did not provide that reasonable proof as they failed to respond to TIG's numerous letters requesting their opinions on causation. Even though it may have seemed, at the time that the IME was requested, that all hope had been lost on receiving answers from the treating physicians, the letter from TIG that specifically indicated that they were awaiting a response from Dr. Kamada is most com-

pelling as to TIG's expectations in this case.

The record reflects, however, that TIG did not fully comply with the plain language of HRS § 431:10C–304(3)(C). TIG received Kauhane's claim for no-fault benefits on October 14, 1996. On November 13, 1996, within thirty days of receiving Kauhane's claim, TIG sent letters to Dr. Nada, KMC, and WCCHC, requesting documents to assist it in evaluating Kauhane's claim. The letter to Dr. Nada also included several questions about Kauhane's medical condition. TIG did not, as required by the statute, "forward to the *claimant* an itemized list of all the required documents" within thirty days of receipt of Kauhane's claim. HRS § 431:10C–304(3)(C) (emphasis added).

More importantly, TIG continued to request additional information even after thirty days had passed following TIG's receipt of Kauhane's claim for no-fault benefits and demand for payment. On December 18, 1996, for example, TIG sent its first request for information to Dr. Kamada. By late January 1997, TIG had received all of the information it had requested during the thirty-day period following receipt of Kauhane's claim. Still not satisfied that Kauhane was entitled to no-fault benefits, however, TIG sent to Dr. Nada another letter containing several follow-up questions. When Dr. Nada responded in April 1997 that he would defer to Dr. Kamada's assessment of Kauhane's medical condition, TIG wrote to Dr. Kamada, requesting that he address the questions previously posed to Dr. Nada. Finally, when Dr. Kamada responded in June 1997, TIG demanded that Kauhane undergo an IME.[17]

■ Nowhere in HRS § 431:10C–304(3) is there any language authorizing an insurer

case-by-case basis pursuant to the adjudicatory process set forth in the Hawaii Administrative Procedures Act, HRS chapter 91. Furthermore, different Insurance Commissioners have not interpreted the requirements of HRS § 431:10C–304(3)(C) in the same way, thus leading to confusion among insurance companies as to what their obligations are under the statute. We strongly urge the Insurance Commissioner to adopt rules to flesh out the fuzzy contours of the Insurance Code, HRS chapter 431, so that confusion does not reign as to what the requirements of the law are.

17. In all fairness to TIG, we realize that in the absence of rules fleshing out the requirements of HRS § 431:10C–304(3), TIG had very little guidance as to the proper procedure to follow when faced with an uncertain claim. Indeed, it appears from the record on appeal and statements made by counsel during oral arguments before this court that TIG's actions in requesting documents and an IME were sanctioned by previous Insurance Commissioners.

to continue to request additional information or loss documentation from a claimant or a claimant's medical providers more than thirty days after the insurer has received a claim for no-fault benefits and a demand for payment. Moreover, there is no provision in HRS § 431:10C–304(3) that authorizes an insurer to require a claimant to provide documents that did not exist at the time the insurer requested the "additional information," e.g., a causation opinion letter.[18] Given the legislative intent that no-fault insurance claims be promptly acted upon, we construe HRS § 431:10C–304(3) as allowing an insurer that needs more information or loss documentation to evaluate a no-fault benefits claim, to submit to the claimant one itemized list[19] of additional information or loss documents already existing that the insurer requires to determine whether to grant or deny the claim. If the information for documents requested are not provided, an insurer is free to deny the claim.[20]

In this case, TIG requested documentation from Kauhane's medical providers more than thirty days after receiving Kauhane's claim for no-fault benefits, requested non-existent documents, and insisted that Kauhane undergo an IME. TIG clearly violated the provisions of HRS § 431:10C–304(3) when it held up determining Kauhane's claim pending receipt of the requested documents and Kauhane's undergoing an IME.

**B.** *The Insurance Commissioner Was Not Authorized to Order TIG to Pay Kauhane's No-fault Benefits without Determining the Substantive Merits of Kauhane's Claim*

 After ruling that TIG had violated HRS § 431:10C–304 by not paying or denying Kauhane's claim in a timely manner, the Insurance Commissioner declined to rule on the merits of TIG's denial. Instead, the Insurance Commissioner essentially "defaulted" TIG and ordered it to pay Kauhane's no-fault benefits. We conclude that the Insurance Commissioner exceeded his statutory authority in doing so. *See* HRS § 91–14(g)(2).[21]

 An administrative agency can only wield powers expressly or implicitly granted to it by statute. Implied powers are limited to those "reasonably necessary to make [an] express power effective." *See, e.g., Washington Pub. Ports Ass'n v. State, Dep't of Revenue,* 62 P.3d 462, 466 (Wash. Jan.30, 2003) (an administrative agency "possesses only those powers either expressly granted or necessarily implied from statutory grants of authority"); *D.A.B.E., Inc. v. Toledo–Lucas County Bd. of Health,* 96 Ohio St.3d 250, 259, 773 N.E.2d 536, 545–46 (Ohio 2002) (a "grant of power [to an administrative agency], by virtue of a statute, may be either express or implied, but the limitation put upon the implied power is that it is only

18. In this case, Kauhane had no control over the information that TIG claims to have been waiting for before deciding her claim. There does not appear to have been anything Kauhane could have done to force Drs. Nada and Kamada to answer the specific questions posed by TIG. The doctors had already been paid by Kauhane's health insurer and had no incentive to provide the detailed responses to TIG's questions. Moreover, it is questionable whether any treating physician would have been able to answer the difficult medical causation questions posed by TIG with any reasonable degree of medical certainty.

19. We note that HRS § 431:10C–304(3)(C) provides that an insurer shall forward to the claimant, within the specified time period, "an itemized list of all the required documents." There is no provision allowing more than one list to be forwarded.

20. A claimant whose claim for no-fault benefits has been denied because the claimant has failed to provide the additional information or loss documentation required by the insurer, pursuant to HRS § 431:10C–304(3)(C), then has three options: (1) give up the claim entirely, (2) resubmit the claim after gathering the requested information and documents, or (3) file a request with the Insurance Commissioner for an administrative hearing to contest the insurer's denial of the claim.

21. HRS § 91–14(g) (1993) states, in relevant part, as follows:

Upon [judicial] review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

. . . .

(2) In excess of the statutory authority or jurisdiction of the agency[.]

such as may be reasonably necessary to make the express power effective.... [T]he rules are well settled that the intention of the grant of power, as well as the extent of the grant, must be clear; that in case of doubt that doubt is to be resolved not in favor of the grant but against it."); *Hauser v. Nebraska Police Standards Advisory Council,* 264 Neb. 605, 609, 650 N.W.2d 760, 764 (Neb. 2002) ("Administrative bodies have only that authority specifically conferred upon them by statute or by construction necessary to achieve the purpose of the relevant act."); *Pub. Util. Comm'n of Texas v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 315 (Tex.2001) ("The basic rule is that a state administrative agency has only those powers that the Legislature expressly confers upon it. But an agency may also have implied powers that are reasonably necessary to carry out the express responsibilities given to it by the Legislature."); *Flynn v. State Ethics Comm'n,* 87 N.Y.2d 199, 202, 661 N.E.2d 991, 993, 638 N.Y.S.2d 418, 420 (1995) ("Jurisdiction to act will be inferred only when it is 'required by *necessary implication*'"); *United States v. Miami Univ.,* 294 F.3d 797, 807 (6th Cir.2002) ("If Congress does not expressly grant or necessarily imply a particular power for an agency, then that power does not exist.").

We have been unable to locate any statutory or other authority that expressly authorizes the Insurance Commissioner to procedurally default insurers if they fail to decide claims within the statutorily prescribed time period.

Instead, HRS § 431:10C–304(4) provides for the assessment of interest on the amounts of no-fault benefits which are unpaid thirty days after the insurer has received reasonable proof of the fact and amount of no-fault benefits accrued and demand for payment:

> (4) Amounts of benefits which are unpaid thirty days after the insurer has received reasonable proof of the fact and the amount of benefits accrued, and demand for payment thereof, after the expiration of thirty days, shall bear

interest at the rate of one and one-half per cent per month.

Additionally, at the time Kauhane's claims arose, HRS § 431:10C–304(6) (1993)[22] clearly stated that "[a]ny insurer who violates this section shall be subject to section 431:10C–117(b) and (c) [ (1993) ]." Pursuant to HRS § 431:10C–117(b) and (c):

> (b) Any person, in the capacity of a licensed or unlicensed motor vehicle insurer, self-insurer, general agent, subagent, solicitor, or other representative, who violates any provision of this article shall be assessed a civil penalty not to exceed $5,000 for each violation.
>
> (c) Any person, in the capacity of a licensed or unlicensed motor vehicle insurer, self-insurer, general agent, subagent, solicitor, or other representative, who knowingly violates any provision of this article shall be assessed a civil penalty of not less than $3,000 and not to exceed $10,000 for each violation.

Furthermore, pursuant to HRS § 431:10C–117(d) (1993):

> (d) (1) Violations of subsections (b) and (c) shall be subject to the construction that each repetition of such act shall constitute a separate violation.
>
> (2) The imposition of any civil penalty under subsections ... (b) or (c) shall be in addition to, and shall not in any way limit or affect the application of, any other civil or criminal penalty, or other public safety condition or requirement, provided by law.

While the Insurance Commissioner was authorized to order TIG to pay interest on an untimely paid claim or to assess civil penalties against TIG, we are unable to find any statutory language that "necessarily implies" that the Insurance Commissioner may also "default" insurers for failure to timely determine or pay a claim.

## CONCLUSION

Based on the foregoing discussion, we vacate the Final Judgment entered by the cir-

---

**22.** Paragraph (6) of HRS § 431:10C–304 was renumbered to paragraph (7) after amendments

to the section were made in 2000. *See* HRS § 431:10C–304(7) (Supp.2002).

cuit court on March 20, 2001 and remand this case to the circuit court, with instructions that the circuit court vacate the Insurance Commissioner's Final Order dated August 4, 2000 and remand this case to the Insurance Commissioner for further proceedings on the substantive merits of Kauhane's claim, consistent with this opinion.

Because the Insurance Commissioner's Final Order, which awarded attorney's fees and costs to Kauhane, will be vacated by the circuit court and this case will be remanded to the Insurance Commissioner for further proceedings on the substantive merits of Kauhane's claim, it is unnecessary for us to decide TIG's point of error that the Insurance Commissioner abused his discretion in awarding attorney's fees and costs.