97 P.3d 372

**LANAI COMPANY, INC.,**
Appellant–Appellee,

v.

**LAND USE COMMISSION and Lanaians for Sensible Growth, Appellees–Appellants**

and

**Office of State Planning and County of Maui Planning Department, Appellees–Appellees.**

No. 22564.

Supreme Court of Hawai'i.

Sept. 17, 2004.

Russell A. Suzuki and James J.S. Chang, Deputy Attorneys General, on the briefs, for appellee-appellant Land Use Commission.

Alan T. Murakami and Carl C. Christensen (Native Hawaiian Legal Corporation), on the briefs, Honolulu, for appellee-appellant Lanaians for Sensible Growth.

Gary W. Zakian, Deputy Corporation Counsel, County of Maui, on the briefs, for appellee-appellee County of Maui.

Bruce L. Lamon and Ellen Cirangel (Goodsill Anderson. Quinn & Stifel), on the briefs, Honolulu, for appellant-appellee Lanai Company, Inc.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

In this appeal, Appellees–Appellants Land Use Commission (the LUC) and Lanaians for

Sensible Growth (Sensible Growth) contest the April 26, 1997 order of the Circuit Court of the Second Circuit (the court)[1] reversing the LUC's May 17, 1996 order (1996 Order) which, *inter alia,* required Appellant–Appellee Lanai Company, Inc. (LCI)(1) to immediately cease and desist any use of water from the high level aquifer for irrigation of the Manele golf course on the island of Lanai pursuant to Condition 10 of its April 6, 1991 Order (1991 Order) and (2) to file a detailed plan with the LUC within sixty days, specifying how it will comply with the LUC's 1991 Order requiring water use from alternative non-potable water sources outside of the high level aquifer. For the reasons set forth herein, we (1) hold that Hawai'i Rules of Civil Procedure (HRCP) Rule 52(a) does not apply to a circuit court's review in an appeal from an agency decision; (2) affirm the court's conclusion that the LUC's 1996 Order was clearly erroneous to the extent it interpreted Condition No. 10 of its 1991 Order as precluding the use by LCI of "any" or all water from the high level aquifer; and (3) remand the case to the court, with instructions that the court remand this case to the LUC for clarification of its findings, or for further hearings if necessary, on the issue of whether LCI used potable water from the high level aquifer in violation of Condition No. 10.

## I.

On November 29, 1989, LCI's predecessor in interest, Lanai Resort Partners,[2] petitioned the LUC to amend the land use district boundary at Manele, on the island of Lanai, from rural and agricultural districts to an urban district.[3] LCI planned to develop an eighteen-hole golf course as an amenity of the Manele Bay Hotel. On October 10, 1990, Sensible Growth, the Office of Hawaiian Affairs (OHA), and LCI signed a memorandum of agreement (the Agreement).[4] It appears from the record that the Agreement was included as Appendix K of the *Manele Golf Course and Golf Residential Project Environmental Impact Statement* (Environmental Impact Statement or EIS), "accepted by the Maui Planning Commission as an accurate environmental disclosure document."[5] The Agreement provided in relevant part that LCI, in "consideration of the mutual promises and agreements" between the parties, agreed to "[e]nsure that no high level ground water aquifer[6] will be used for golf course maintenance or operation (other than as water for human consumption) and that all irrigation of the golf course shall be through alternative non-potable water sources."

Sensible Growth and LCI submitted proposed findings of fact (findings), conclusions of law (conclusions), and orders, in February of 1991.[7] Sensible Growth's proposed order recommended that the LUC impose a condition that "no high level ground water aquifer will be used for golf course maintenance or operation (other than water for human consumption) and that all irrigation of the golf course shall be through alternative non-potable water sources."

By the 1991 Order, the LUC granted LCI's petition. The LUC made the following relevant findings, conclusions, and Decision and Order (order), describing, *inter alia,* the

---

1. The Honorable Shackley Raffetto presided.

2. As stated, Lanai Resort Partners was the predecessor in interest to LCI. LCI is a subsidiary of Castle and Cooke, Inc. For the sake of simplicity, the three companies will hereinafter collectively be referred to as "LCI."

3. On February 9, 1990, the Office of Hawaiian Affairs (OHA), Sensible Growth, Solomon Kaopuiki, John D. Gray, and Martha Evans petitioned to intervene. On March 9, 1990, the LUC permitted OHA and Sensible Growth to intervene, but denied the petition as to Solomon Kaopuiki, John D. Gray, and Martha Evans.

4. Initially, Sensible Growth intervened in opposition to the proposed golf course, but later withdrew its opposition after entering into the Agreement.

5. Both Sensible Growth and LCI acknowledge that the Agreement was attached as Appendix K to the EIS accepted by the Maui Planning Commission.

6. "Aquifer" is defined as "a water-bearing stratum of permeable rock, sand, or gravel." *Webster's Seventh New Collegiate Dictionary,* 44 (1965) [hereinafter *Webster's* ].

7. Sensible Growth only submitted a proposed decision and order, and did not submit proposed findings or conclusions.

sources of water for golf course irrigation and granting reclassification of the land:

*FINDINGS OF FACT*

*IMPACT UPON RESOURCES OF THE AREA*

. . . .

*Water Resources*

45. Lanai draws its *domestic water and pineapple irrigation supply from the high level aquifer* which has a sustainable yield of [six million gallons per day (mgd) ].

46. The proposed golf course at Manele of which the Property is to be a part, *will be irrigated with nonpotable water from sources other than potable water from the high level aquifer.*[8]

47. [LCI's] golf course design consultant . . . is projecting that 624,000 [gallons per day (gpd) ] will be required for irrigation of a "target" golf course,[9] but [LCI] is conservatively projecting 800,000 gpd for irrigation of the golf course.

48. *[LCI] proposes to provide alternate sources of water for golf course irrigation by developing the brackish water supply.*[10] According to [LCI], Wells Nos. 9 and 12 which have capacities of about 300,000 gpd and 200,000 gpd, respectively, have been tested but are not yet operational. Well No. 10 which has a capacity of approximately 100,000 gpd with a possible potential of 150,000 gpd has also been tested and will be available. *Currently available also is brackish water from Well No.*

1 which is operational and which has a capacity of about 600,000 gpd.

49. [LCI's] civil, sanitary and environmental engineering consultant, James Kumagai [ (Kumagai) ], *stated that it is only a matter of cost to develop wells for brackish water sources that are already there.* The consultant also state[d] that the brackish water sources necessary to supply enough water for golf course irrigation could be developed and be operational within a year.

. . . .

*Water Service*

89. [LCI] is now in the process of developing the *brackish water supply* for irrigation of the proposed golf course. According to [LCI], *Well No. 1, which is operational and available, and Well Nos. 9, 10 and 12, which have been subjected to full testing, have aggregate brackish source capacity in excess of the projected requirements* of 624,000 gpd to 800,000 gpd for the Manele golf course.

. . . .

91. *[LCI] intends to irrigate the golf course with nonpotable water, leaving only the clubhouse which will use potable water,* the requirement for which should be insignificant.

CONFORMANCE WITH THE HAWAII STATE PLAN

. . . .

---

**8.** The term for "potable" water is ordinarily defined as "suitable for drinking." *Webster's* at 664. The 1991 Order did not define the term "potable" or "nonpotable." The parties attributed other meanings to the term "potable" and disagree as to the means of measuring potability. LCI notes that the Maui County Code defines as potable, for the purposes of golf course irrigation, any water containing less than 250 milligrams per liter of chlorides. Maui County Code § 24.240.020. LCI notes that this definition of potability is also used by the United States Environmental Protection Agency (EPA) as a secondary standard and by the State of Hawai'i Department of Health as a recommended guideline.

Sensible Growth challenges LCI's interpretation of potability, and questions why Maui County should determine that the water from wells 1 and 9 referred to herein are "non-potable" solely because it is above 250 parts per million in

chloride, when it has determined that water with similar or higher chloride readings in other parts of Maui County to be "potable." Sensible Growth further contends that Maui County Code § 24.240.020 defines " 'potable water' not on chloride levels alone, but on other contaminant levels established by the EPA." The LUC is not clear as to the definition to be given "potable water." *See* discussion *infra.*

**9.** A "target" golf course is described in an earlier finding by the LUC as a golf course in which the turf will be used "for the tees, the fairways and the greens with intervening areas between some of the tees, fairways and greens which intervening areas are left undeveloped in their natural states."

**10.** "Brackish" is defined as "somewhat salty, distasteful." *Webster's* at 101.

117. [LCI] has stated that the Manele golf course will be irrigated with *nonpotable* water from sources other than the *potable* water from the high level aquifer.

. . . .

## CONFORMANCE TO STATE LAND USE URBAN DISTRICT STANDARDS

122. The Property is proposed to be developed as a golf course to serve as an amenity of the Manele Bay Hotel.

## CONCLUSIONS OF LAW

Pursuant to Chapter 205 of the [HRS] and the [LUC] Rules, the [LUC] finds upon a preponderance of the evidence that the reclassification of the Property . . . subject to the conditions in the Order, for a golf course . . . is reasonable, nonviolative of Section 205–2, [HRS] . . . and is consistent with the Hawaii State Plan . . . and conforms to the Hawaii [LUC] Rules.

## ORDER

IT IS HEREBY ORDERED that the Property . . . for reclassification from the Rural Land Use District to the Urban Land Use District as to 110.243 acres thereof, shall be and is hereby approved, and the District Boundaries are amended accordingly, subject to the following conditions:

. . . .

11. The Water Commission's Resubmittal–Petition for Designating the Island of Lanai as a Water Management Area contains the following relevant provisions:

Hawaii's Water Code, HRS § 174C–44 establishes eight criteria which the [Water] Commission must consider in deciding whether to designate a ground water area as a water management area under the Code. . . .
*None of the ground-water criteria cited in § 174C–44, HRS, has been met to support the designation of the island as a water management area . . . .*
(Emphasis added.) The Water Commission went on to make recommendations which required LCI to report water use to the Water Commission, and to formulate a plan in the event of a water shortage. The Water Commission also recommended that there be annual public informational meetings regarding the island's water conditions.

10. *[LCI] shall not utilize the potable water from the high-level groundwater aquifer* for golf course irrigation use, and *shall instead develop and utilize only alternative non-potable sources of water* (e.g., brackish water, reclaimed sewage effluent) for golf course irrigation requirements.

In addition, [LCI] shall comply with the requirements imposed upon [LCI] by the State [of Hawai'i] Commission on Water Resource Management [ (the Water Commission) ] as outlined in the [Water Commission's] Resubmittal–Petition for Designating the Island of Lanai as a Water Management Area, dated March 29, 1990.[11]

11. *[LCI] shall fund the design and construction* of all necessary water facility, improvements, *including source development* and transmission, to provide adequate quantities of *potable* and *non-potable* water to service the subject property.

. . . .

18. *Non[-]potable* water sources shall be used towards all nonconsumptive uses during construction of the project.

. . . .

20. [LCI] shall develop the property in *substantial compliance with representations made* to the [LUC] in obtaining reclassification of the property. *Failure to so develop may result in reclassification of*

At some undefined point, the Water Commission issued a permit to LCI to use Well No. 9, one of the wells at issue in this case. LCI argues that the Water Commission thus specifically approved the use of non-potable, brackish water from the high level aquifer for irrigation of the golf course. However, in a letter dated October 26, 1993, the Water Commission noted that "[w]ater usage generally is not a consideration for the issuance of well construction and pump installation permits."
The Commission went on to state that, in regard to Well No. 9, "aquifer harm from the use of water was not evident; hence, the question of prudence in allowing non-potable water to be used for irrigation at Manele Bay, as raised at the LUC hearing, was not material to the [Water] Commission deliberations when it issued the Well 9 permit." Thus, the Water Commission neither approved, nor disapproved the use of high level aquifer water for purposes of golf course irrigation.

*the property to its former land use classification.*

. . . .

(Emphases added.)

## II.

Subsequent to the reclassification of the land and pursuant to the 1991 Order, the Maui County Council (the County Council), on February 17, 1993, submitted a letter to then-Mayor Linda Crockett Lingle (Mayor Lingle). The County Council noted that "[LCI] ha[d] gone to the [LUC] and stated that water [would] be needed from the high level aquifer, an existing source, which violate[d] the commitment made during the approval process." The County Council explained that "[w]hen the approval was given, it was understood that [LCI] was committed to finding a new source or sources of water to adequately take care of the irrigation needs of the Manele Project." As such, the County Council requested that the Mayor's office direct the Land Use and Codes Division to stop work on the golf course until LCI developed a new source of water.

LCI responded to the County Council's letter in correspondence dated March 4, 1993, addressed to Mayor Lingle. LCI declared that "[b]rackish and treated effluent [would] be used for golf course and landscape irrigation.... These brackish wells for the golf course irrigation are in compliance to [sic] Ordinance No.2066 enacted by the County Council on December 17, 1991." [12] Mayor Lingle wrote on March 4, 1993, in response to the City Council, that "[she did] not find a specific prohibition on the use of high-level *brackish* water." (Emphasis in original.)

On March 12, 1993, Appellee–Appellee County of Maui Planning Department [hereinafter Maui Planning Dept. or County]

wrote to Mr. Thomas Leppert (Leppert), President of Castle and Cooke Properties, Inc.[13] In this letter, the Maui Planning Dept. acknowledged that "recent correspondence from [the County Council] have raised questions in regards [sic] to use of high-level water and the meaning of the water-related conditions attached to the various land use approvals for the golf course." The Maui Planning Dept. went on to indicate that it understood "that the golf course and resort residential irrigation would not draw from the island's limited high-level aquifer." The Maui Planning Dept. cited both Condition No. 10 from the 1991 Order and the Agreement to support its contention. *See supra* Part I.

After discussions with Leppert, the Maui Planning Dept. again reiterated to LCI, in a letter dated March 17, 1993, that the parties had "agreed to *'ensure that no high level ground water [would] be used for golf course maintenance or operation ... and that all irrigation of the golf course shall be through alternative non-potable water sources.'* " (Emphasis in original.) The Maui Planning Dept. further noted that it and "the [County Council] based their [sic] respective decisions to allow the Manele golf course to proceed" on such representations made by LCI. As such, the Maui Planning Dept. directed that "based on ... your previous representations, [LCI] ... *shall not use any water drawn from the high level aquifer for golf course construction, dust control, or irrigation purposes.*" (Emphasis in original.)

On March 25, 1993, LCI responded to the Maui Planning Dept., reporting that it was "in compliance with all conditions imposed ... in connection with this project...." LCI also argued that, in the Agreement, "the term 'high level ground water aquifer' was not used in a technical sense, but rather in

---

**12.** Maui County Ordinance Number 2066, codified as Maui County Code Chapter 20.24, entitled "Restrictions on use of potable water for golf courses," reads in pertinent part as follows:

§ 20.24.010(B)

A golf course can use as much as one million gallons of water per day for irrigation and other nondomestic purposes and it is inappropriate to use potable water for such a purpose. *The purpose of this chapter is to prevent the use*

*of potable water for irrigation and other nondomestic purposes at golf courses* by restricting the approval of any permit necessary for golf course construction, if that golf course cannot show that it will use a nonpotable source of water.

(Emphasis added.)

**13.** *See supra* note 2.

its colloquial sense on Lanai as being synonymous with potable or drinking water...."

### III.

On October 13, 1993, pursuant HRS § 205-4 (1993),[14] the LUC issued an order to show cause [hereinafter OSC or Order to Show Cause] as to why the land "should not revert to its former classification or be changed to a more appropriate classification." This OSC was based upon the LUC's belief that LCI had "failed to perform according to Condition No. 10" and LCI "[had] failed to develop and utilize alternative sources of non-potable water for golf course irrigation requirements."

The OSC provided, in pertinent part, as follows:

### ORDER TO SHOW CAUSE

TO: [LCI]

YOU ARE HEREBY COMMANDED, under the authority of [HRS § 205-4], and Hawaii Administrative Rules [ (HAR) § ] 15-15-93, to appear before the [LUC], State of Hawaii, ... on December 14, 1993, ... to show cause why that certain land at Manele, Lanai, Hawaii, ... referred to as the Subject Area, ... *should not revert to its former land use classification.*

The [LUC] has reason to believe that you have *failed to perform according to Condition No. 10 of the [1991 Order]* in that you have *failed to develop and utilize alternative sources of non-potable water for golf course irrigation requirements.* Condition No. 10 was imposed by the [LUC] *after [LCI] made representations that water from the high level groundwater aquifer would not be used for golf course irrigation.*

[HRS § 205-4] authorizes the [LUC] to impose conditions necessary to *"assure*

*substantial compliance with representations made by [LCI] in seeking a boundary change"* and that *"absent substantial commencement of use of the land in accordance with such representations,* the [LUC] shall issue and serve upon the party bound by the condition an order to show cause why the property should not revert to its former land use classification."

Accordingly, the [LUC] will conduct a hearing on [this] matter in accordance with the requirements of chapter 91, [HRS] and subchapters 7 and 9 of [HAR chapter 15-15].. All parties in this docket *shall present testimony and exhibits to the [LUC] as to whether [LCI] has failed to perform according to Condition No. 10 and the representations made by [LCI] in seeking the land use reclassification.*

(Emphases added.)

The LUC held a pre-hearing conference on November 8, 1993, and conducted a series of hearings, which included LCI, the Maui Planning Dept., Appellee–Appellee the Office of State Planning, and Sensible Growth.[15] On November 22, 1993, Sensible Growth submitted a position statement, maintaining that (1) LCI previously represented to the LUC that it would not be taking any water from the high level aquifer, and would instead be relying solely on alternative sources of water and (2) LCI was indirectly using potable water from the high level aquifer. LCI responded on November 29, 1993, asserting that (1) Condition No. 10 only prohibited the use of potable water from the high level aquifer and that the water being used by LCI was nonpotable and (2) LCI had made good faith efforts to develop alternate sources of water.

On November 23, 1993, the Maui Planning Dept. submitted testimony which included its determination that LCI had "complied with [C]ondition No. 10 as written and narrowly interpreted." However, the Maui Planning

---

14. HRS chapter 205 established the LUC. HRS § 205-4(g) provides in relevant part as follows:

The commission may provide by condition that absent substantial commencement of use of the land *in accordance with such representations, the commission shall issue and serve upon the party bound by the condition an order to show cause why the property should not revert to its*

*former land use classification or be changed to a more appropriate classification.*
(Emphasis added.)

15. Hearings took place on October 6 and 7, 1994, December 14 and 15, 1994, March 8 and 9, 1995, and February 1 and 2, 1996. These hearings culminated in the LUC's findings, conclusions, and order dated May 17, 1996.

Dept. did point out that LCI had failed to perform according to its representations:

> [LCI's] inclusion of more specific language in the [Agreement] between [LCI] and [Sensible Growth], as well as in County Land Zoning Ordinance No. 2132,[16] would indicate the representation of [LCI] *not to use any of the high level source. Therefore, the County finds that [LCI] has failed to perform according to its representations made during the proceedings,* but that such failing was not intentional nor in bad faith. . . . The County recommends that the [Manele land] should not revert to its former classification.

(Emphasis added.)

On December 29, 1993, LCI moved for an order modifying Condition No. 10. LCI requested that condition 10 be modified to read as follows:

> 10. No potable groundwater from the high level aquifer will be used for golf course maintenance or operation (other than as water for human consumption and irrigation adjacent to the clubhouse and maintenance building). All irrigation of the golf course shall

be through nonpotable water sources, *including brackish water from the lower portion of the high level aquifer. . . .*

(Emphasis added.) [17]

On May 17, 1996, "the [LUC] having heard and examined all testimonies, evidence, and arguments presented by [LCI], [Maui Planning Dept.], the Office of State Planning, and [Sensible Growth]," and the entire record therein, issued the following relevant findings, conclusions, and order:

### FINDINGS OF FACT

*Procedural Matters*

1. On October, 13, 1993, the [LUC] issued an [OSC] . . . commanding [LCI] to appear before the Commission to show cause why the [p]roperty should not revert back to its former land classification or be changed to a more appropriate classification. . . . The OSC was issued due to the [LUC's] reason to believe that [LCI] has failed to perform according to Condition No. 10 of the . . . [1991 Order,] . . . and has failed to develop and utilize only alter-

---

**16.** Maui County Ordinance No. 2132, codified as Maui County Code Chapter 19.70, entitled "Lanai project district I (Manele)," read in pertinent part as follows:

§ 19.70.085(D)

Irrigation. *No high level ground water aquifer will be used for golf course maintenance or operation* (other than as water for human consumption) and that *all irrigation of the golf course shall be through alternative nonpotable water sources.*

(Emphases added.) The language of Maui County Ordinance No. 2132, § 19.70 085(D), is identical to the language found in section six, part d, of the Agreement between LCI and Sensible Growth. *See supra* Part I. Maui County Ordinance No. 2408 revised § 19.70.085 in 1995. The relevant revised portion reads in pertinent part as follows:

§ 19.70.085(C)

Irrigation. Effective January 1, 1995[,] *no potable water drawn from the high level aquifer may be used for irrigation of the golf course,* driving range and other associated landscaping. *The total amount of nonpotable water drawn from the high level aquifer that may be used for irrigation of the golf course,* driving range and other associated landscaping shall not exceed an average of six hundred fifty thousand gallons per day expressed as a moving annualized average using thir-

teen to twenty-eight day periods rather than twelve calendar months or such other reasonable withdrawal as may be determined by the Maui County Council upon advice from its standing committee on water use.

(Emphases added.)

**17.** LCI submitted an amendment to the motion for an order modifying Condition No. 10 on August 9, 1995. In this amended motion, LCI requested that Condition No. 10 be worded as follows:

Effective January 1, 1995[,] no potable water drawn from the high level aquifer may be used for irrigation of the golf course, driving range and other associated landscaping. The total amount of nonpotable water drawn from the high level aquifer that may be used for irrigation of the golf course, driving range and other associated landscaping shall not exceed an average of 650,000 gallons per day expressed as a moving annualized average using [thirteen to twenty-eight] day periods rather than [twelve] calender months or such other reasonable withdrawal as may be determined by the Maui County Council upon advice from its standing committee on water use.

This language is verbatim the language of amended Maui County Ordinance No. 2408, § 19.70.085(C). *See supra* note 16.

native non-potable water sources for golf course irrigation requirements.

. . . .

*Property Description*

. . . .

7. The subject Property is located at Manele, Lanai, and is identified as Tax Map Key No.: 4–9–02: portion of 49 (formerly Tax Map Key No.: 4–9–02: portion of 1).

8. The [p]roperty was reclassified from the Rural and Agricultural Districts to the Urban District pursuant to [Findings], [Conclusions], and Decision and order issued April 16, 1991 . . . .

. . . .

10. The [p]roperty is currently being utilized for the golf course, and other related uses, including a clubhouse.

*Condition No. 10*

. . . .

11. Condition No. 10 of the [1991 Order] reads as follows:

*[LCI] shall not utilize the potable water from the high-level groundwater aquifer* for golf course irrigation use, and *shall instead develop and utilize only alternative non-potable sources of water* (e.g., brackish water, reclaimed sewage effluent) for golf course irrigation requirements.

In addition, [LCI] shall comply with the requirements imposed upon [LCI] by [the Water Commission] as outlined in the [Water Commission's] Resubmittal–Petition for Designating the Island of Lanai as a Water Management Area, dated March 29, 1990.

12. The Water Resources Development Plan for the Island of Lanai defined alternative sources as water resources that are *outside of the high-level aquifer, particularly low-level fresh and brackish waters that underlie Palawai Basin and beyond, and reclaimed sewage effluent.*

13. *[LCI] represented that its intent was to utilize alternative sources and it did not expect to use potable water for irrigation. [LCI] also stated that it would not use water from the high-level aquifer for irrigation of the golf course, believing that use of such resource would be inappropriate.*

14. Throughout the original proceedings on the subject docket, [LCI] used the *term "high level aquifer" to be synonymous with potable water. [LCI] defined alternative sources of water as water sources outside of the high level aquifer.* [LCI's] definition also included water reclamation and effluent. [LCI] noted that alternate sources were "everything outside of the high level aquifer or outside of the influence of or external factors that would influence the high-level aquifer."

15. Irrigation for the [p]roperty is currently being supplied primarily from brackish Wells No. 1 and 9, located in the Palawai Basin, *which are within the high level aquifer. . . .*

16. [LCI] has completed an extended pump test of Wells. No. 1 and 9, . . . . [which] found no anomalous behavior in the wells. [LCI] found no evidence of impact upon the quality or water level of the potable water wells located at a higher elevation within the high level aquifer.

17. [LCI] represents that the extended pump test of Wells 1 and 9, which lasted eighteen days, may not be sufficient. . . .

18. Historical data indicates that between 1971 and 1987, there have been declines in water levels approximately 155 feet. Historical data also indicates that pumping during this period ranged from 100,000 gallons per day to 400,000 gallons per day.

. . . .

21. [LCI's] water consultant agrees that the high level aquifer consists of smaller aquifers that are hydrologically connected, and must be treated as a single unit to establish a sustainable yield for the high level aquifer.

22. [LCI's] water consultant agrees that the small aquifers are interconnected, and there is leakage from the high level potable water area into the low level brackish area.

23. [LCI's] water consultant states that a drop in salinity from 800 milligrams per liter to 300 milligrams per liter corre-

sponds to a mixture of fresh water and seawater.

24. Petitioner utilizes a definition for potable water found in Maui County Code, to determine potability of water being drawn from Wells No. 1 and 9. Section 20.24.020 of the Maui County code pertains to restrictions on use of potable water for golf courses. Said section of the Maui County code defines potable water as water containing less than 250 milligrams per liter of chlorides.

. . . .

26. The potability of any water source does not depend on any particular level of chloride concentration.

27. The EPA has primary standards involving certain chemical constituents that may be found in water that may have been polluted. The EPA also has a guideline of 250 parts per million for chlorides, which is a secondary standard that can be exceeded without affecting potability.

28. Primary, not secondary, standards determine whether water is potable or not. The secondary standards, including chloride, would never be used to determine whether water is potable or not.

29. *[LCI] has not performed a comprehensive test to determine the potability of water from Wells No. 1 and 9.*

30. *As more water is pumped from Wells No. 1 and 9, it is likely that the salinity will drop as more potable water leaks into the dike compartments in the secondary recharge zone to replace the water being pumped.*

. . . .

32. *[LCI] acknowledges that Condition No. 10 could be interpreted to restrict use of any water from the high level aquifer.*

. . . .

**18.** HAR, Title 15, Department of Business, Economic Development & Tourism, Chapter 15, Land Use Commission Rules, § 15–15–93, states in relevant part as follows:

*Whenever the commission shall have reason to believe that there has been a failure to perform according to the conditions imposed,* or the representations or commitments made by the petitioner, the *commission shall issue and serve upon the party* or person bound by the conditions, representations, or commitments,

CONCLUSIONS OF LAW

. . .

Pursuant to section 15–15–93,[ [18] HAR], the [LUC] finds upon a preponderance of the evidence that [LCI] has failed to perform according to Condition No. 10 of the [1991 Order].

(Emphases added.) The LUC accordingly ordered that "LCI shall" (1) "comply with Condition No. 10 of the [1991 Order]" and, as previously mentioned, (2) "immediately cease and desist any use of water from the high level aquifer for golf course irrigation requirements[,]" and (3) "file a detailed plan with the LUC within [sixty] days, specifying how it [would] comply with this Order requiring water use from alternative non-potable water sources outside of the high level aquifer for golf course irrigation requirements." On May 20, 1996, the LUC issued an order denying LCI's amendment to the motion for an order modifying Condition No. 10.

IV.

On June 7, 1996, LCI appealed the LUC's May 17, 1996 decision and order to the court. On November 19, 1996, LCI submitted its opening brief. On December 30, 1996, the Maui Planning Dept. filed its answering brief.[19] It requested that "the court ... seriously consider the impact on the citizens of Maui county living on Lanai, and the county generally, should the court affirm the LUC's decision." The County further asserted that, while it did not enforce the LUC's Condition No. 10, it did enforce its own zoning ordinance, Maui County Code § 19.70.085(C). *See supra* note 16.

The LUC filed its answering brief on January 3, 1997. An answering brief was also

*an order to show cause* why the property should not revert to its former land use classification or be changed to a more appropriate classification.
(Emphases added.)

**19.** Although the Maui Planning Dept. identifies itself as "Appellee," and titles its brief an answering brief, it argues essentially that LCI did not violate LUC Condition No. 10, and that the LUC cease and desist order should be reversed.

submitted by Sensible Growth on the same day. On January 13, 1997, LCI filed a reply brief.

On March 10, 1997, the court issued an order reversing the 1996 Order to cease and desist. The court found that the "[c]ease and [d]esist [o]rder was in excess of the statutory authority or jurisdiction of the agency as provided in HRS § 91–14(g)(2)." The court specifically limited its ruling to the cease and desist order and did not disturb the LUC's finding that LCI violated Condition No. 10 of the LUC's 1991 Order or that LCI submit a plan for a source of irrigation water outside the high-level aquifer.

## V.

On March 20, 1997, LCI filed a motion to alter or amend the judgment. LCI requested that the LUC's 1996 Order be reversed. LCI argued that the LUC's conclusion that LCI violated Condition No. 10 was wrong as a matter of law. On June 26, 1997, the court denied LCI's motion to alter or amend the judgment.

On July 16, 1997, LCI appealed the court's decision to this court. Sensible Growth cross-appealed on July 25, 1997, and the LUC cross-appealed on July 28, 1997.[20] On September 22, 1997, this court dismissed the appeal and cross-appeals because the court did not enter a judgment in favor of and against the parties on appeal, and thus, the appeal was premature.

On April 26, 1999, the court entered an order reversing the LUC's 1996 Order. The judgment was in favor of LCI and the County and Office of State Planning.[21] The court reversed the LUC on, *inter alia,* the ground

that "[t]he LUC's conclusion that [LCI] violated Condition No. 10 was arbitrary, capricious, and clearly erroneous." On May 20, 1999, Sensible Growth filed a notice of appeal. On May 21, 1999, the LUC filed its notice of appeal.

## VI.

We affirm the court's order with respect to its ruling that LUC's determination that LCI had violated Condition 10 was clearly erroneous but on the grounds stated herein and only with respect to LUC's finding that LCI was prohibited from using any water from the high level aquifer.[22] As mentioned, we remand the question of whether LCI was using potable water from the high level aquifer to the court, with instructions to remand the issue to the LUC. *See TIG Ins. Co. v. Kauhane,* 101 Hawai'i 311, 329, 67 P.3d 810, 828 (2003) (remanding the case to the circuit court with instructions to remand the case to the Insurance Commissioner for further proceedings); *Iaea v. TIG Ins. Co.,* 104 Hawai'i 375, 383, 90 P.3d 267, 275 (App.2004). In light of our disposition, we vacate the other parts of the court's order. *See Taylor–Rice v. State,* 91 Hawai'i 60, 73, 979 P.2d 1086, 1099 (1999) ("[T]his court may affirm a judgment of the trial court on any ground in the record which supports affirmance.)

## VII.

■ " 'Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under re-

---

**20.** The Maui Planning Dept. did not cross-appeal.

**21.** The Office of State Planning took no position in the current appeal and did not submit any briefs. The County of Maui's brief did not seek reversal of the court's March 10, 1997 order, but responded "specifically to the issue ... that the County failed to enforce [C]ondition [N]o. 10 of the LUC's order."

**22.** The court also reversed the LUC's 1996 Order on the grounds that (1) "the LUC was ... without jurisdiction to issue an order requiring [LCI] to cease and desist using water from Lanai's high level aquifer[ ]" because "[a]ll waters of the State

are subject to regulation by the [Water Commission,]" (2) "[t]he LUC ... lacked jurisdiction to enforce Condition No. 10" because "jurisdiction to enforce such conditions lies with the counties[,]" (3) "the LUC ... acted in excess of its statutory authority[,]" "[b]y issuing a cease and desist order," and (4) "[t]he 1996 Order violates the Hawaii State Plan by tending to destroy a golf course previously found by the LUC to conform to and help satisfy the provisions of [HRS] chapter 226." Because our disposition results in the remand of Condition 10, it is unnecessary or premature to consider such other grounds to the extent they are raised by the parties on appeal.

view was right or wrong in its decision.' " *Soderlund v. Admin. Dir. of the Courts*, 96 Hawai'i 114, 118, 26 P.3d 1214, 1218 (2001) (quoting *Farmer v. Admin. Dir. of Court*, 94 Hawai'i 232, 236, 11 P.3d 457, 461 (2000)) (brackets omitted). It is well settled "that in an appeal from a circuit court's review of an administrative decision the appellate court will utilize identical standards applied by the circuit court. The clearly erroneous standard governs and agency's findings of fact, whereas the courts may freely review and agency's conclusions of law." *Dole Hawaii Division–Castle & Cooke, Inc. v. Ramil*, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) (citing *Int'l. Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 322, 713 P.2d 943, 950 (1986)).

## VIII.

■ Initially we address Sensible Growth's point on appeal that the court vio-

23. HRCP Rule 52(a) states in relevant part as follows:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. . . . Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in subdivisions (b) and (c) of this rule.

24. In light of our disposition, we do not believe it necessary to engage in an extended discussion of the other appeal points raised by Sensible Growth to the effect that (1) the court improperly substituted its own judgment for that of an agency in finding that the LUC's conclusion was arbitrary and capricious; (2) LCI cannot attack the validity of conditions set forth in the LUC's 1991 Order because LCI failed to appeal the 1991 Order; (3) the court improperly based its decision on evidence not in the administrative record; (4) the LUC's 1996 Order does not conflict with the state water code because the Water Commission does not have exclusive jurisdiction to regulate water use in Lanai, which has not been designated a water management area; (5) the LUC can issue a cease and desist order to

lated HRCP Rule 52(a) [23] by failing to give a reasoned explanation for its reversal of the 1996 Order to cease and desist.[24] "Review of a decision made by the circuit court upon review of an agency's decision is a secondary appeal. The standard of review is one in which the court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [(1993)] to the agency's decision." *Morgan v. Planning Dep't, County of Kauai*, 104 Hawai'i 173, 179, 86 P.3d 982, 988 (2004).[25]

Sensible Growth argues that the court violated HRCP Rule 52(a), because it "failed to provide the required . . . explanation of its reversal of the LUC's action. . . ." LCI correctly notes that HRCP Rule 52(a) only requires a statement of facts in "actions tried upon the facts." When a court reviews the decision of an administrative agency, HRS § 91–14(g) [26] governs.

enforce conditions of its approval of a boundary amendment; (6) LCI waived the issue, by not raising it before the LUC, of whether the 1996 Order would violate the Hawai'i State Plan by "tending to destroy" the golf course; and (7) the LUC's 1996 Order conformed to the Hawai'i State Plan, HRS chapter 226.

We note that as to (1), the court was empowered to review LUC's decision pursuant to HRS chapter 91; as to (2), the LUC's OSC implicitly raised the validity of the 1991 Order's conditions; as to (3), the record supports the court's determination that the LUC's decision was clearly erroneous; as to (4), (6), and (7), because the LUC order is vacated in part and remanded in part on the grounds stated herein, a discussion of these issues would be premature; as to (5), because we remand the case, we do confirm the LUC's power to order a party to refrain from violating a condition of approval. *See* discussion *infra*.

25. In a related way, Sensible Growth argues that on remand to the court from this court in 1997, "the only task before the [court] was to render a final judgment" and thus the court "went outside the scope of its prior order" regarding LCI's violation of Condition No. 10 in its April 26, 1999 order reversing the LUC's May 17, 1996 order. As we discuss *infra*, no obligations were imposed on the court under HRCP Rule 52(a).

26. HRS § 91–14 entitled "Judicial review of contested cases," provides in part:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceed-

According to HRS § 91–14(g), the court could either affirm, remand, reverse, or modify the administrative agency decision after reviewing the record. The administrative agency creates the record, and the circuit court reviews it. In this case, LUC was the initial trier of fact, and the court acted in an appellate capacity in reviewing the LUC's findings and conclusions. Hence, the matter was not an "action tried upon the facts" within the meaning of HRCP Rule 52(a) because the court reviewed the record rather than tried the facts.[27] HRCP Rule 52(a) therefore does not apply to the court's determinations.

## IX.

■ We affirm the court's conclusion that the LUC's 1996 Order was clearly erroneous in deciding that LCI violated Condition No. 10 of the 1991 Order for using water from the high level aquifer in light of (1) the plain language of Condition No. 10, (2) the use of "potable" and "non-potable" as separate and distinct terms in other parts of the order, (3) LUC's rejection of Sensible Growth's proposed 1991 order, and (4) the map submitted to the LUC which clearly indicated that Well No. 1 was inside the high level aquifer.[28] The LUC erred inasmuch as it now seeks to enforce, through its 1996 Order, a version of the substance of Condition No. 10 of the 1991 Order which it had apparently previously rejected.

## A.

■ The LUC based its findings and conclusions in the 1996 Order on evidence and arguments presented by LCI, the Maui Planning Dept., the Office of State Planning, and Sensible Growth. As noted, HRS § 91–14(g) "enumerates the standards of review applicable to an agency appeal." *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i 401, 421, 83 P.3d 664, 684 (2004). Where an agency's conclusion of law, such as the LUC's conclusion that LCI violated Condition No. 10, "presents mixed questions of fact and law[, it] is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." *Id.*

■ "[A] mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." *Id.; Child Support Enforcement Agency v. Roe*, 96 Hawai'i 1, 12, 25 P.3d 60, 71 (2001); *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999); *see also* HRS § 91–14(g). " 'Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclu-

ings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or order are:
 (1) In violation of constitution or statutory provisions; or
 (2) In excess of the statutory authority or jurisdiction of the agency; or
 (3) Made upon unlawful procedure; or
 (4) Affected by other error of law; or
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

27. Sensible Growth argues that, according to *Scott v. Contractors License Bd.*, 2 Haw.App. 92, 626 P.2d 199 (1981), a circuit court must articulate detailed findings, pursuant to HRCP Rule

52(a), when overturning an agency's order. However, LCI correctly notes that *Scott* is distinguishable from this case because, in *Scott*, the court's ruling was so vague that the Intermediate Court of Appeals could not determine whether the ruling was based on substantive or procedural grounds. In this case, the court clearly set forth its reasons for reversing the LUC. Thus, *Scott* does not control in this case.

28. In arriving at our disposition we consider but do not concur with LUC's point on appeal that the court should be reversed because substantial credible evidence supports the LUC's finding that LCI violated Condition No. 10. In view of our holding, we need not decide LUC's points that (1) the court must be reversed because the LUC had jurisdiction to enforce the conditions it imposed upon granting a boundary amendment petition and (2) the water code does not confer upon the Water Commission exclusive jurisdiction over all state waters.

sion.' " *Child Support Enforcement Agency*, 96 Hawai'i at 11, 25 P.3d at 71 (quoting *In re Water Use Permit Applications (Waiahole)*, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)) (brackets and internal quotation marks omitted); *see Leslie*, 91 Hawai'i at 399, 984 P.2d at 1225.

### B.

LCI argues the language of Condition No. 10 *only* prohibits the use of *potable* water, and, thus, the use of non-potable water from the high level aquifer was allowed for golf course irrigation. On the other hand, on appeal, LUC and Sensible Growth construe the language of the condition as prohibiting the use of *all* water from the high level aquifer, irrespective of whether the water was potable or brackish.

█ The LUC maintains that throughout the proceedings, the term "high level aquifer" was used interchangeably with the term potable water, and that the 1991 Order mandated that LCI was to develop and utilize only alternative, non-potable sources of water, that is to say, sources outside of the high level aquifer. According to the LUC, "[d]uring the original hearings LCI represented that Well 1 and a proposed Well 9 would be alternate sources for non-potable water," located outside the high level aquifer, in the Palawai Basin.[29] The LUC notes that on

March 9, 1990, Leppert[30] testified that LCI's "intent all along on this is to use *alternative sources* of water. . . . I think that's important, because we are *not using the high[ ]level aquifer* for the use of this golf course. We don't think that's appropriate." (Emphasis added.)[31] Also, the LUC observes that when LCI's Kumagai was asked whether there were "any alternate sources other than the high level aquifer," he replied, "Yes, there are alternate sources of water, . . . *alternate sources meaning water sources outside the high level aquifer.* . . . [B]asically it's everything outside of the high level aquifer or outside the influence of or external factors that would influence the high level aquifer."[32] (Emphasis added.) The LUC therefore asserts that it believed "that the high level aquifer consisted of only potable water" based on representations made by LCI.

Sensible Growth also asserts that LCI had previously represented on various occasions that it would not be taking any water from the high level aquifer.

### C.

In opposition, LCI points out that "[Sensible Growth] specifically proposed, prior to the entry of the 1991 Order, that the LUC impose a condition that '*no high level ground water aquifer will be used for golf course*

29. The LUC claims its understanding is supported by a letter to LCI from Manabu Tagomori, Manager–Chief Engineer, Department of Land and Natural Resources. In responding to LCI's March 29, 1993 letter inquiring about the use of the term "high level aquifer" during the 1989 to 1991 meetings, Tagomori wrote that

the term "high level aquifer" was used by some participants as synonymous with "potable water" since Lanai's drinking water comes from the highest compartments of the high level aquifer. . . . At that time groundwater in Palawai [B]asin *pumped by Well 1 was not included in the "high level aquifer" as the term was then being used.*
(Emphasis added.)

30. As noted, Leppert is the president of LCI.

31. The LUC notes that Leppert responded to a question as to which wells were located in the Palawai Basin by stating that, "you have [well] one, and [well] nine down in the crater here." However, the LUC provides no citation to the

record for this quote by Leppert. Moreover, the LUC only refers to "p. 3039" as the record citation for the preceding testimony by Kumagai. However, the portion of the record under "3039" consists of two hundred pages. The aforementioned quotes by Kumagai and Leppert were not found, despite searching such portions of the record. This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions. *See Miyamoto v. Lum*, 104 Hawai'i 1, 11 n. 14, 84 P.3d 509, 519 n. 14 (2004) (explaining that an appellate court is not required to sift through the voluminous record for documentation of a party's contentions); *Traders Travel Int., Inc. v. Howser*, 69 Haw. 609, 616, 753 P.2d 244, 248 (1988).

32. The testimony was from the July 12, 1990 LUC hearing. The LUC further describes Kumagai's additional testimony as being that "development of alternate sources" included drilling, especially in the Palawai Basin . . . in an effort to seek out alternate sources of water."

*maintenance or operation* (other than water for human consumption) *and that all irrigation of the golf course shall be through alternative non-potable water sources.'* " [33] (Emphases added.) Such a condition, which would have clearly prohibited the use of any water from the high level aquifer, was not adopted by the LUC in its 1991 Order. LCI maintains that the "LUC rejected this language in favor of prohibiting just the use of potable water form the high-level ground water aquifer as set forth in [Condition No. 10]." Thus, LCI argues that "[i]nasmuch as the LUC rejected [Sensible Growth's] proposed conditions, which would have articulated the precise condition [the] LUC now proposes to enforce[,]" Sensible Growth should not be allowed to present testimony "to show that [Condition No. 10] does not mean what it says."

### X.

The plain language of Condition No. 10 does not prohibit LCI from using *all* water from the high level aquifer. As mentioned previously, Condition No. 10 of the 1991 Order reads, in pertinent part, as follows:

> *[LCI] shall not utilize the potable water from the high-level groundwater aquifer* for golf course irrigation use, and *shall instead develop and utilize only alternative non-potable sources of water* (e.g., brackish water, reclaimed sewage effluent) for golf course irrigation requirements.

(Emphases added.) *See supra* 105 Hawai'i page 300, 97 P.3d page 376. We must read the language of an administrative order in the context of the entire order and construe it in a manner consistent with its purpose. *Cf. Gray v. Admin. Dir. of the Court, State of Hawai'i,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (explaining that "we read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose"). Condition 10 utilized the terms "potable" and "non-potable." It is evident from their use that the terms encompassed separate and distinct meanings. *Cf. id.* (determining the meaning of the ambiguous words in a statute by "examining the context, with which the ambiguous words,

phrases, and sentences may be compared, in order to ascertain their true meaning").

On its face, Condition No. 10 does not preclude the use of non-potable water, nor does it indicate that only potable water exists in the high-level aquifer. Rather, the use of the term "potable," as distinguished from "non-potable," implies the possibility of non-potable water in the high level aquifer. If the LUC interpreted "potable water" as synonymous with all water from the high level aquifer, it is unclear why a prohibition against the use of all water was not expressly adopted, to avoid confusion when both the terms potable and non-potable are employed in the same paragraph.

Although Condition No. 10 seemingly mandates that "only alternative non-potable sources of water" shall be used, it does not on its face exclude as a source "non-potable" water that may exist in the high level aquifer. Condition 10 only precluded LCI from "utiliz[ing] the potable water" from the high level aquifer; it did not also prohibit the use of "non-potable water." Accordingly, it is not apparent that Condition 10 was meant to exclude the use of "non-potable" water.

### XI.

The 1991 Order utilized the terms "potable" and "non-potable" in separate and distinct ways. For example, finding 46 and finding 117 stated that the proposed golf course would "be irrigated with" "*nonpotable* water from sources other than *potable* water from the high level aquifer." Similarly, finding 91 used both terms in explaining that LCI intended to "irrigate the golf course with *nonpotable* water, leaving only the clubhouse which [would] use *potable* water." The 1991 Order's Condition No. 11 determined that LCI was required to "provide adequate quantities of *potable* and *non-potable* water to service the subject property." Condition No. 18 stated that "*nonpotable* water sources shall be used towards all nonconsumptive uses during construction." It is evident, then, that the terms encompassed separate

---

**33.** Specifically, LCI cites to Sensible Growth's proposed order.

and distinct meanings and were used in that sense throughout the 1991 Order.

## XII.

LCI's interpretation of Condition No. 10 is further supported by the apparent rejection of Sensible Growth's proposed order prior to the entry of the 1991 Order, and LUC's substantial adoption of LCI's proposed findings relating to the aquifer in the 1991 Order.[34]

Sensible Growth's proposed order stated that no water from the high level aquifer would be employed for golf course purposes:

*Proposed Findings of Fact, Conclusions of Law, and Decision and Order*

. . . .

In light of the [Agreement,[35]] . . . as part of the decision and order of the commission, they propose the inclusion of the following terms, consistent with the memorandum of agreement[ [36]]:

*Decision and Order*

IT IS HEREBY ORDERED that the Petition for Reclassification of the district boundaries for the petition area, . . . is hereby reclassified . . . subject to the following conditions:

. . . .

4. [LCI] shall ensure that *no high level ground water aquifer will be used for golf course maintenance or operation* (other than water for human consumption) and that all irrigation of the golf course shall be through alternative non-potable water source.

(Emphasis added.) Thus, Sensible Growth's proposed order contained express language which would have prohibited the use of *any* water from the high level aquifer for golf course maintenance.

LCI's proposed order, on the other hand, only prohibited the use of *potable* water from the high level aquifer, as follows:

*Water Resources*

45. Lanai draws its domestic pineapple irrigation supply from the high level aquifer which has a sustainable yield of 6 mgd.

46. The proposed golf course at Manele of which the Property is to be a part *will be irrigated with nonpotable water from sources other than potable water from the high level aquifer.*

47. [LCI's] golf course design consultant . . . is projecting 624,000 gpd will be required for irrigation of a "target" golf course, but [LCI] is conservatively projecting 800,000 gpd for irrigation of the golf course.

48. [LCI] *proposes to provide alternate sources of water for golf course irrigation by developing the brackish water supply.* According to [LCI], *Well Nos. 9* and *12* which have capacities of 300,000 gpd and 200,000 gpd, respectively, have been tested but are not yet operational. . . . *Currently available also is brackish water from Well No. 1 which is operational* and which has a capacity of about 600,000 gpd.

49. [LCI's] civil, sanitary and environmental engineering consultant, James Kumagai, stated that it is only a matter of cost to develop wells for brackish water sources that are already there. The consultant also states that the brackish water sources necessary to supply enough water for golf course irrigation could be developed and be operational within a year.

. . . .

---

34. In addition, the Maui Planning Dept. filed exceptions to LCI's proposed order. The parties do not clarify whether the LUC ordered them to submit proposed decisions. However, the record reveals that the LUC approved the parties' stipulation for an extension of time to file proposed orders.

35. Sensible Growth's proposed order states that it "reflects the execution of a memorandum agreement among [Sensible Growth], OHA, [and LCI] on November 5, 1990." There are no refer-

ences in Sensible Growth's opening brief to an agreement entered into on November 5, 1990. In the record is an Agreement executed on October 10, 1990 which, like Sensible Growth's proposed order, prohibited the use of any water from the high level aquifer for golf course maintenance. *See supra.*

36. Accordingly, it appears that the LUC considered the Agreement prior to the issuance of the 1991 Order.

*Water Service*

89. [LCI] is *now in the process of developing the brackish water supply for irrigation* of the proposed golf course. According to [LCI], *Well No. 1,* which is operational and available, and Well *Nos. 9, 10, and 12, which have been subjected to full testing, have aggregate brackish source capacity in excess of the projected requirements* of 624,000 gpd to 8000 gpd for the Manele golf course.

. . . .

91. [LCI] *intends to irrigate the golf course with nonpotable water,* leaving only the clubhouse which will use potable water, the requirement for which should be insignificant.

### ORDER

IT IS HEREBY ORDERED that the Petition ... for reclassification ... shall be and is hereby approved, ... subject to the following conditions:

. . . .

10. *[LCI] shall not utilize the potable water from the high-level groundwater aquifer* for golf course irrigation use, and *shall instead develop and utilize only alternative non-potable sources of water* (e.g., brackish water, reclaimed sewage effluent) for golf course irrigation requirements.

In addition, [LCI] shall comply with the requirements imposed upon [LCI] by [the Water Commission] as outlined in the [Water Commission's] Resubmittal–Petition for Designating the Island of Lanai as a Water Management Area, dated March 29, 1990.

11. *[LCI] shall fund the design and construction* of all necessary water facility, improvements, *including source development* and transmission, to provide adequate quantities of potable and non-potable water to service the subject property.

. . . .

(Emphases added.) (Internal record citations omitted.)

As previously noted, in the 1991 Order, the LUC entered certain findings 45–49, 89, 91, and Conditions 10, 11, and 20, reproduced *supra.* It is manifest that the LUC's 1991 Order adopted language substantially similar or identical to that of LCI's proposed order. LCI's proposed findings 46, 47, 49, 89, and 91 are identical to LUC's findings 46, 47, 49, 89, and 91 of the 1991 Order. Proposed finding 45 is virtually identical to finding 45 of the 1991 Order, other than the inclusion of the word "water" in the 1991 Order.[37] Similarly, Conditions 10 and 11 of the proposed order are identical to Conditions 10 and 11 of the 1991 Order.[38]

The LUC, in the 1991 Order, acknowledged that it had "heard and examined" the proposed findings and conclusions and thereby issued its findings, conclusions and decision and order accordingly. HRS § 91–12 [39] requires that, in every agency decision in a contested case, "if any party to the proceeding has filed proposed findings of fact, the agency shall incorporate in its decision a ruling upon each finding so presented." However, an agency need not enter a separate ruling on each finding, for "all that is required is that the agency incorporate its findings in its decision." *In re Terminal Transp., Inc.,* 54 Haw. 134, 137, 504 P.2d 1214, 1216 (1972).

---

**37.** Proposed finding 45 states that LCI "draws its domestic and pineapple irrigation supply from the high level aquifer[,]" while finding 45 of the 1991 Order states that LCI "draws its domestic *water* and pineapple irrigation supply from the high level aquifer[.]" (Emphasis added.)

**38.** LCI's proposed order did not include anything comparable to Condition 20 of the 1991 Order, which required LCI "to develop the property in substantial compliance with representations made to the [LUC] in obtaining reclassification of the property" and stated that failure to do so could "result in reclassification of the property to its former land use classification."

**39.** HRS § 91–12 entitled "Decisions and orders," provides in pertinent part that

[e]very decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law. *If any party to the proceeding has filed proposed findings of fact, the agency shall incorporate in its decision a ruling upon each proposed finding so presented. . . .*

(Emphasis added.)

It is evident that the LUC considered and rejected Sensible Growth's proposed language which would have prohibited the use of *all* water from the high level aquifer. Instead, the LUC, in Condition No. 10, only instructed that "LCI shall not utilize the *potable* water from the high-level groundwater aquifer for golf course irrigation use." *See supra* 105 Hawai'i pages 300 and 312, 97 P.3d pages 376 and 388. In light of the opposing proposals concerning use of the high level aquifer, one precluding the use of "any" water, and the other prohibiting the use of "potable" water, it is difficult to credit the LUC's assertion that potable water was understood to preclude the use of "any" or all water from the high level aquifer.

### XIII.

Further, the LUC's assertion that it believed "that the high level aquifer consisted of only potable water" is not supported by any of the findings in the 1991 Order. The 1991 Order does not make any express findings which prohibit the use of Wells No. 1 and 9. The map [40] provided during the 1991 hearings appears to indicate that Well No. 1 and the Palawai Basin [41] were both located within the high level aquifer. If the LUC

believed that the high level aquifer only consisted of potable water, or that Wells No. 1 and 9 were not to be used, it could have expressly said so in the 1991 Order. Indeed, the mention of Wells No. 1 and 9 in finding 48 of the 1991 Order,[42] suggests that the use of these wells, and their brackish water supply, was permissible.

### XIV.

As related above, there was evidence that LCI represented that it would not use any water from the high level aquifer.[43] While such evidence existed, the ultimate order of the LUC did not incorporate the representation into a condition. In that light, we believe that a person exercising reasonable caution would not conclude that the evidence submitted with respect to the 1996 OSC was of sufficient quality so as to support the conclusion that Condition 10 of the 1991 Order was violated because Condition 10 precluded LCI from using any water at all from the high level aquifer. The plain text of Condition 10, the separate and distinct uses of the terms potable and non-potable throughout the 1991 Order, LUC's apparent rejection of Sensible Growth's proposed or-

40. The LUC noted that this was "the only map ... offered into evidence during the 1991 hearings." Looking to the record, other maps are listed as exhibits, dated prior to the 1991 hearings. However, it appears that the LUC maintains that only one map was provided as to the location of the wells, the Palawai Basin, and the high level aquifer. If the LUC was unclear as to the location of the wells, or the potability of the water in the high level aquifer, it could have made further inquiries and findings in this regard. Yet, as noted, no such findings are present in the 1991 Order.

41. The parties apparently refer to the Palawai Basin as a geographical indicator to reference what was represented as being located outside or inside the high level aquifer. As discussed, the LUC asserts that LCI represented that Wells No. 1 and 9 were located *outside* the high level aquifer, and *inside* the Palawai Basin, such that they believed the wells to be "alternate sources" and not in the high level aquifer. *See supra.* However, finding 15 of the May 17, 1996 order relates that "[i]rrigation for the [p]roperty is currently being supplied primarily from brackish Wells No. 1 and 9, located in the Palawai Basin, *which are within the high level aquifer.* ..." (Emphasis added.)

42. As previously noted, finding 48 of the 1991 Order provided as follows:

> 48. *[LCI] proposes to provide alternate sources of water for golf course irrigation by developing the brackish water supply.* According to [LCI], *Wells Nos. 9* and 12 which have capacities of about 300,000 gpd and 200,000 gpd, respectively, *have been tested but are not yet operational.* Well No. 10 which has a capacity of approximately 100,000 gpd with a possible potential of 150,000 gpd has also been tested and will be available. *Currently available also is brackish water from Well No. 1 which is operational* and which has a capacity of about 600,000 gpd.
> (Emphases added.)

43. In its memorandum in response to the OSC, LCI focused on the interpretation of the 1991 Order, asserting that (1) use of non-potable water from the high level aquifer was permitted under Condition No. 10, (2) it was LCI's understanding that "the obligation to develop alternate sources was only to the extent of any shortfall," (3) it had made good faith efforts to develop alternate sources of water, and (4) the potability standard intended for and applicable to Condition No. 10 must coincide with the EPA standard.

der, the similarity between LCI's proposed findings and the LUC's adopted findings in the 1991 Order, and the map submitted to the Commission indicating that Well No. 1 was inside the high level aquifer, weigh decisively against this basis for the LUC's 1996 Order. Hence, this interpretation of the 1991 Order was not supported by substantial evidence in the record and must be deemed "clearly erroneous." HRS § 91–14(g).

Assuming, *arguendo,* that LCI's representations that it would not use any water from the high level aquifer, constituted substantial evidence, we have, based on the grounds stated above, a "definite and firm conviction" that the LUC made a "mistake" in attempting to enforce such an interpretation of Condition No. 10. *See In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i at 421, 83 P.3d at 684.

## XV.

Moreover, the LUC's decision was "affected by other error of law." HRS § 91–14(g)(4). The LUC cannot now enforce a construction of Condition 10 that was not expressly adopted. This court has mandated that, in issuing a decision, an "agency must make its findings reasonably clear. The parties and the court should not be left to guess, with respect to any material question of fact, or to any group of minor matters that may have cumulative significance, the precise finding of the agency." *In re Water Use Permit Applications (Waiahole),* 94 Hawai'i at 158, 9 P.3d at 470 (quoting *In re Kauai Elec. Div. Of Citizens Utilities Co.,* 60 Haw. 166, 183, 590 P.2d 524, 537 (1978) [hereinafter *Kauai Elec.*]); *In re Terminal Transp., Inc.,* 54 Haw. at 139, 504 P.2d at 1217; *cf. In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i at 432, 83 P.3d at 695 (explaining that any presumption of validity, given to an agency's decision, "presupposes that the agency has grounded its decision in reasonably clear" findings of fact and conclusions of law).

 Parties subject to an administrative decision must have fair warning of the conduct the government prohibits or requires, to ensure that the parties are entitled to fair notice in dealing with the government and its agencies. *See e.g., Gates & Fox v. Occupational Saftey & Health Review Comm'n,* 790 F.2d 154, 156 (D.C.Cir.1986) (reasoning that an "employer is entitled to fair notice in dealing with his government," and thus the agency's regulations "must give an employer fair warning of the conduct it prohibits or requires"). In this light, the 1991 Order cannot be construed to mean what the LUC may have intended but did not express. *Cf. id.* (explaining that "a regulation cannot be construed to mean what an agency intended but did not adequately express"). An administrative agency, such as the LUC, has the responsibility of stating with ascertainable certainty what is meant by the conditions it has imposed. *Cf. id.* (reasoning that the "enforcer of the act has the responsibility to state with ascertainable certainty what is meant by the standards he has promulgated"). The plain language of Condition No. 10 did not give fair notice, or adequately express any intent on the LUC's part that LCI be precluded from using *all* water from the high level aquifer.

## XVI.

 LCI thus was not prohibited from using all water from the high level aquifer by Condition 10. In that context, Sensible Growth argues that LCI did use potable water from the high level aquifer,[44] and, thus, the court erred in reversing the 1996 Order. The 1996 Order stated that "pursuant to [HAR § 15–15–93], the [LUC] finds upon a preponderance of the evidence that [LCI] has failed to perform according to Condition No. 10 of the [1991 Order]." [45]

---

**44.** As discussed, the parties disagreed on the applicable standard to be used to determine potability. LCI relied on the definition of potability provided in the Maui County Code § 24.240.020, which defines "potable water as water containing less than 250 milligrams per liter of chlorides."

Sensible Growth contends that even the Maui County Code § 24.240.020 defines " 'potable wa-

ter' not on chloride levels alone, but on other contaminant levels established by the EPA." The LUC, in its May 17, 1996 order stated that "the potability of any water does not depend on any particular level of chloride concentration."

**45.** The LUC argues that it properly assigned to LCI, the burden of proving that it was in compliance with Condition No. 10 regarding the use of

In its 1996 Order, however, the LUC does not expressly state whether the use of potable water by LCI was the ground for the LUC's conclusion that Condition No. 10 was violated, as opposed to its understanding that LCI was not to use *any* water from the high level aquifer. The LUC maintains that its 1996 Order was based upon the "repeated representations that (1) the high level aquifer was synonymous with 'potable water,' (2) alternate non-potable water sources were located outside the high level aquifer," and (3) LCI's intention was to "not [use] water from the high level aquifer to irrigate the Manele Golf Course." The LUC did not focus on the appropriate standard for determining potability but, rather, notes that in the hearings prior to the 1991 Order, "LCI did not elaborate about the existence of potable and nonpotable water within the high level aquifer."

The 1996 Order included the following findings pertinent to the potability issue:

15. Irrigation for the [p]roperty is currently being supplied primarily from brackish Wells No. 1 and 9, located in the Palawai Basin, *which are within the high level aquifer.* ...

....

21. [LCI's] water consultant agrees that the high level aquifer consists of smaller aquifers that are hydrologically connected, and must be as a single unit to establish a sustainable yield for the high level aquifer.

22. [LCI's] water consultant agrees that the small aquifers are interconnected, and *there is leakage from the high level potable water area into the low level brackish* area.

23. [LCI's] water consultant states that a drop in salinity from 800 milligrams per liter to 300 milligrams per liter corresponds to a mixture of fresh water and seawater.

24. Petitioner utilizes *a definition for potable water found in Maui County Code,*

to determine potability of water being drawn from Wells No. 1 and 8. Section 20.24.020 of the Maui County code pertains to restrictions on use of potable water for golf courses. Said section of the Maui County code *defines potable water as water containing less than 250 milligrams per liter of chlorides.*

....

29. *[LCI] has not performed a comprehensive test to determine the potability of water from Wells No. 1 and 9.*

30. *As more water is pumped from Wells No. 1 and 9, it is likely that the salinity will drop as more potable water leaks into the dike compartments in the secondary recharge zone to replace the water being pumped.*

....

32. *[LCI] acknowledges that Condition No. 10 could be interpreted to restrict use of any water from the high level aquifer.*

....

(Emphases added.)

Sensible Growth contends that the LUC "found that LCI failed to show that it was *not* using potable water." (Emphasis added.) In support of this assertion, the LUC points to finding 26 of the 1996 Order, which states that the "potability of any water source does not depend on any particular level or chloride concentration." Findings 24 through 27 indicated that LCI utilized a definition of potable water which is dependent on the particular *chloride* concentration level. In findings 29 and 30 of the 1996 Order, Sensible Growth notes that the LUC found that (1) LCI failed to perform a "comprehensive test to determine the potability of water from Wells No. 1 and 9" and (2) fresh potable water is replacing the water pumped from Wells No. 1 and 9.

In this regard, Sensible Growth points to testimony of Rae Loui (Loui), the chair of the state Water Commission, indicating that the

potable water. Thus, the LUC posits that in order to prove that it was fulfilling its obligations under Condition No. 10, LCI had to demonstrate that the water being used to irrigate the golf course was non-potable. LCI responds that Sensible Growth "makes the erroneous and unsup-

ported comment that LCI bore the burden of proof" that it had complied with Condition No. 10. However, LCI acknowledges, and does not contest, the LUC's application of a preponderance of the evidence standard to the findings.

drawing of brackish water from the aquifer affects the potable water resource. A letter from the Water Commission to LCI regarding Loui's testimony, also explained that the "chlorides in Well 1 dropped from about 700 ppm to between 320 to 350 ppm" which implies that "at least half the water pumped from Well 1 is potable water." [46] Sensible Growth asserts that "since LCI is using potable water for its golf course, it is reasonable to conclude that it is in violation" of Condition No. 10.

On the other hand, LCI responds that finding 15 of the 1996 Order states that "[i]rrigation for the [golf course] is currently being supplied *primarily* from *brackish* Wells No. 1 and 9, ... which are within the high level aquifer[,]" (emphasis added), finding 16 states that the LCI "has completed an extended pump test of Wells No. 1 and 9, which ... provided non-potable, brackish water[,]" and finding 31 reflects that LCI "has spent approximately 2.5 million dollars to develop the brackish water system, and to ensure that only brackish water ... is being utilized."

Although such findings are relevant to the issue of whether potable water is being used, the LUC makes no specific finding or conclusion as to whether LCI was using potable water. Additionally, it is not clear from finding No. 30, whether the potable water leaking into Wells No. 1 and 9 is a direct result of LCI's actions, or if such leakage would occur irrespective of LCI's water usage. Similarly, assuming LCI's use is affecting potable water in the high level aquifer, the LUC did not indicate whether such an effect would qualify as "utiliz[ing] the potable water" under Condition No. 10.

Contrary to LCI's assertions, the findings of the 1996 Order also fail to establish that potable water is *not* being used. Although finding 15 states that irrigation is "primarily" being supplied from brackish wells, this would not preclude the possibility that some

potable water is also being used. Finding 16 that "Wells No. 1 and 9 ... provide non-potable, brackish water[,]" is countered by finding 29, which states that LCI "has not performed a comprehensive test to determine the potability of Wells No. 1 and 9." Additionally, the findings explain that "there is leakage from the high level potable water area to the low level brackish water area."

While such findings seem to imply that LCI was using potable water, the LUC did not include any express findings in this regard in its 1996 Order. As such, the LUC has failed to "make its findings reasonably clear" as to whether LCI was using potable water in violation of Condition No. 10. *In re Water Use Permit Applications (Waiahole)*, 94 Hawai'i at 158, 9 P.3d at 470 (quoting *Kauai Elec.*, 60 Haw. at 183, 590 P.2d at 537); *In re Terminal Transp., Inc.*, 54 Haw. at 139, 504 P.2d at 1217. This court should "not be left to guess, with respect to any material question of fact ... the precise finding of the agency." *In re Water Use Permit Applications (Waiahole)*, 94 Hawai'i at 158, 9 P.3d at 470 (quoting *Kauai Elec.*, 60 Haw. at 183, 590 P.2d at 537).

In the present case, the LUC has not provided sufficient "findings or conclusions that would enable meaningful review of" whether LCI has violated the prohibition against use of potable water in Condition No. 10. *Id.* HRS § 91–14 provides that, upon review of an agency decision, an appellate court may "remand the case with instructions for further proceedings."

Accordingly, we remand the issue of whether LCI has violated Condition No. 10 by utilizing potable water from the high level aquifer, to the court, with instructions to remand the case to the LUC for clarification of its findings and conclusions, or for further hearings if necessary. *See TIG Ins. Co.*, 101 Hawai'i at 329, 67 P.3d at 828 (remanding the case to the circuit court with instructions to remand the case to the Insurance Commis-

46. Loui's testimony is from the LUC hearing on August 12, 1993, as summarized in the letter from the Water Commission to LCI dated October 26, 1993. However, the LUC made no find-

ing in its 1996 Order to the effect that one-half of the water pumped from Well 1 was potable water.

sioner for further proceedings); *see In re Water Use Permit Applications (Waiahole)*, 94 Hawai'i at 158, 9 P.3d at 470 (remanding a matter to the agency for "proper resolution" where the agency had "not provided any findings or conclusions that would enable meaningful review of its decision"); *Kauai Elec.*, 60 Haw. at 183, 590 P.2d at 537 (remanding for further proceedings and requiring the agency to make appropriate findings). " 'It is familiar appellate practice to remand causes for further proceedings without deciding the merits.... Such a remand may be made to permit further evidence to be taken or additional findings to be made upon essential points....' " *Kauai Elec.*, 60 Haw. at 183, 590 P.2d at 537 (quoting *Ford Motor Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939)).

## XVII.

### A.

 We confirm several propositions germane to our remand of this case. Whether there has been a breach of Condition No. 10 is a determination to be made by the LUC. Such a determination falls within the authority of the LUC, for HRS § 205–4(g) [47] expressly authorizes the LUC to "impose conditions." Moreover, "absent substantial commencement of use of the land *in accordance with such representations made* ... in seeking [the] boundary change[,]" [48] the LUC is expressly authorized to order a reversion of land to the prior classification. HRS § 205–4(g) (emphasis added). The language of HRS § 205–4(g) is broad, and empowers the LUC to use conditions as needed to (1) "uphold the intent and spirit" of HRS chapter 205, (2) uphold "the policies and criteria established pursuant to section 205–17," [49] and (3) to "assure substantial compliance with representations made by petitioner in seeking a boundary change." *Id.* This statute, however, lacks an express provision regarding cease and desist orders. *See id.*

"It is well established that an administrative agency's authority includes those implied powers that are reasonably necessary to carry out the powers expressly granted." *Morgan*, 104 Hawai'i at 184, 86 P.3d at 993. "The reason for implied powers is that, as a

47. HRS § 205–4(g) provides, in pertinent part, that the LUC, after receiving a petition for land reclassification, shall act to
> approve the petition, deny the petition, or to modify the petition *by imposing conditions necessary to uphold the intent and spirit of this chapter or policies and criteria established pursuant to section 205–17 or to assure substantial compliance with representations made by the petitioner in seeking a boundary change.* The commission may provide by condition that absent substantial commencement of the use of the land *in accordance with such representations,* the commission shall issue and serve upon the party bound by the condition an order to show cause why the property should not revert to its former land use classification.
(Emphases added.)

48. The reclassification of land by the LUC is apparently also referred to as a "boundary change."

49. HRS § 205–17 (1993), entitled "Land use commission decision-making criteria," provides as follows:
> In its review of any petition for reclassification of district boundaries pursuant to this chapter, the commission shall specifically consider the following:

(1) The extent to which the proposed reclassification conforms to the applicable goals, objectives, and policies of the Hawaii state plan and relates to the applicable priority guidelines of the Hawaii state plan and the adopted functional plans;
(2) The extent to which the proposed reclassification conforms to the applicable district standards;
(3) The impact of the proposed reclassification on the following areas of state concern:
(A) Preservation or maintenance of important natural systems or habitats;
(B) Maintenance of valued cultural, historical, or natural resources;
(C) Maintenance of other natural resources relevant to Hawaii's economy, including, but not limited to, agricultural resources;
(D) Commitment of state funds and resources;
(E) Provision for employment opportunities and economic development; and
(F) Provision for housing opportunities for all income groups, particularly the low, low-moderate, and gap groups; and
(4) The representations and commitments made by the petitioner in securing a boundary change.

practical matter, the legislature cannot forsee all the problems incidental to ... carrying out ... the duties and responsibilities of the agency." *Id.* (brackets and internal quotation marks omitted).

HRS chapter 205 does not expressly authorize the LUC to issue cease and desist orders.[50] But the legislature granted the LUC the authority to impose conditions and to down-zone land for the violation of such conditions for the purpose of "uphold[ing] the intent and spirit" of HRS chapter 205, and for "assur[ing] substantial compliance with representations made" by petitioners. HRS § 205-4(g); *Cf. Morgan*, 104 Hawai'i at 185, 86 P.3d at 994 (holding that although HRS chapter 205A does not expressly authorize the Planning Commission to modify permits, the Commission must have jurisdiction to do so to "ensure compliance" with the Coastal Zone Management Act and to "carry out [its] objectives, policies, and procedures"). Consequently, the LUC must necessarily be able to order that a condition it imposed be complied with, and that violation of a condition cease.

### B.

The power to enforce the LUC's conditions and orders, however, lies with the various counties.[51] HRS § 205-12 [52] (1993) delegates the power to enforce district classifications to the counties.[53] HRS § 205-12 mandates that the "appropriate officer or agency charged with the administration of county zoning laws *shall enforce* ... the use classification districts adopted by the [LUC] and the restriction on use and ... shall report to the commission all violations." (Emphasis added.) Pursuant to their enforcement duties under § 205-12, counties have the responsibility to take necessary action against violators. A.G. Opinion 70-72 (1970). Such enforcement covers all land use district classifications and land use district regulations. *Id.* Thus, looking to the express language of HRS § 205-12, it is clear and unambiguous that enforcement power resides with the appropriate officer or agency charged with the administration of county zoning laws, namely the counties, and not the LUC. *Cf. Morgan*, 104 Hawai'i at 190, 86 P.3d at 999 (explaining that the statute expressly granted injunctive power to the circuit court and not the Planning Commission).

There is no provision in HRS § 205-12 that expressly delegates enforcement power to the LUC. If the legislature intended to grant the LUC enforcement powers, it could have expressly provided the LUC with such power. *Cf. id.* (if the legislature intended to

50. The LUC and Sensible Growth argue that the LUC has inherent authority to enforce the conditions it imposes. LCI asserts that the court correctly decided that the County has the authority to enforce Condition No. 10, and that the LUC does not have the power to issue a cease and desist order.

51. While in its briefs LCI refers to the Water Commission as having jurisdiction over "water disputes," it concedes that it is not appealing "either here or below, whether the LUC exceeded its power in *imposing* Condition 10." (Emphasis added.) LCI maintains that it is only arguing that *enforcement* of the conditions in the 1991 Order belongs "to the County of Maui and the Water Commission[,]" as opposed to the LUC. Inasmuch as we agree that the County, and not the LUC, has the power to enforce the LUC's conditions, we do not address LCI's arguments in this regard. We note that LCI apparently did not argue the issue of the Water Commission's jurisdiction before the LUC in the hearings prior to the 1991 Order or the 1996 Order, and LCI provides no citations to the record to that effect.

52. HRS § 205-12 states:

The appropriate *officer or agency charged with the administration of county zoning laws shall enforce* within each county *the use classification districts adopted by the land use commission* and *the restriction on use* and the condition relating to agricultural districts under section 205-4.5 and shall report to the commission all violations.

(Emphases added.)

53. We observe that LCI cites an attorney general's opinion, (A.G.Opinion) 70-22 (Sept. 16, 1970), for the proposition that "[t]he enforcement powers of the counties include an affirmative duty to undertake the necessary legal or other corrective measures against violators of the land use law." Sensible Growth argues that LCI mischaracterizes A.G. Opinion 70-22, and cites A.G. Opinion 72-8, which was issued two years after A.G. Opinion 70-22, and opines that the LUC has enforcement power.

grant the commission injunctive powers, it would have done so expressly). By omitting any such reference, it is apparent the legislature did not intend to grant such enforcement powers to the LUC. *Cf. id.* (by omitting reference to the Planning Commission, the legislature made clear that the power to enjoin is solely granted to the courts). Thus, the LUC does not have the power to enforce a cease and desist order. However, if the LUC finds a violation of a condition, the county has an affirmative duty to enforce the LUC's conditions, according to HRS § 205–12. *Cf. Save Sunset Beach Coalition v. City & County of Honolulu,* 102 Hawai'i 465, 483, 78 P.3d 1, 19 (2003) (observing that the City and County of Honolulu confirmed that it would enforce the appropriate zoning statutes and ordinances).

### XVIII.

Therefore, (1) the court's April 26, 1999 order is affirmed to the extent that it concludes that the LUC erred in interpreting Condition No. 10 as precluding the use of "any" or all water from the high level aquifer, and is vacated in all other respects, and (2) the case is remanded to the court with instructions that the court remand this case to the LUC for clarification of its findings, or for further hearings if necessary, as to whether LCI used potable water from the high level aquifer, in violation of Condition No. 10.